**LOCAL UNION NO. 28, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS**

v.

**MARYLAND CHAPTER NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, INCORPORATED, a Maryland Corporation.**

Civ. Nos. 12926, 13002.

United States District Court
D. Maryland.

May 16, 1961.

Patrick A. O'Doherty and William A. Hegarty, Baltimore, Md., for plaintiff.

William D. Macmillan, James P. Garland, and Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

The basic issue in these two cases consolidated for trial is whether plaintiff has effectively terminated its collective bargaining agreement with defendant.

## Facts

Plaintiff (Local Union) is a local union of the International Brotherhood of Electrical Workers (IBEW); it is a "labor organization" within the meaning of 29 U.S.C.A. § 152(5) and is the collective bargaining representative for employees engaged in an industry affecting commerce within the meaning of 29 U.S. C.A. § 152(7). Defendant (Chapter) is a chapter of the National Electrical Contractors Association Inc. (NECA).

On March 7, 1958, plaintiff and defendant entered into a collective bargaining agreement, which was approved by the International President of IBEW. The portions of the Agreement material to this case are set out in Article I thereof, as follows:

"Article I

"Effective Date—Termination— Amendments—Disputes

"Sec. 1. This agreement shall take effect April 1, 1958, and shall remain in effect until April 1, 1959. It shall continue in effect from year to year thereafter, from April 1 through March 31st of each year, unless changed as hereinafter provided.

"Sec. 2. Either party desiring to change this agreement must notify the other in writing at least 60 days prior to April 1st of any year. When notice of changes only is given, the nature of the changes desired must be specified in the notice and until a satisfactory conclusion is reached in the matter of such changes the original provisions shall remain in full force and effect.

"Sec. 3. This agreement shall be subject to amendment at any time by mutual consent of the parties hereto. Any such amendment agreed upon shall be reduced to writing, signed by the parties hereto and approved by the International Office of the Union the same as this agreement.

"Sec. 4. There shall be no stoppage of work either by strike or lockout because of any proposed changes in this agreement or disputes over matters relating to this agreement. All such matters must be handled as stated herein.

"Sec. 5. There shall be a Local Labor-Management Committee of three (3) representing the Union and three (3) representing Employer. It shall meet regularly at such stated times as it may decide. However, it shall also meet within 48 hours when notice is given by either

party. It shall select its own Chairman and Secretary.

"Sec. 6. All grievances or questions in dispute shall be adjusted by the duly authorized representatives of both parties to this agreement. In the event that these two are unable to adjust any matter within forty-eight (48) hours, they shall refer the same to the Local Labor Management Committee.

"Sec. 7. All matters coming before the Local Labor-Management Committee shall be decided by a majority vote. Four (4) members of the Committee, two (2) from each of the parties hereto, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of its membership and it shall be counted as though all were present and voting.

"Sec. 8. Should this Committee fail to agree or to adjust any matter, such shall then be referred to the 'Council on Industrial Relations for the Electrical Contracting Industry of the United States and Canada.' Its decisions shall be final and binding on both parties hereto.

"Sec. 9. When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matter arose shall not be changed or abrogated until the decision is rendered."

Amendments to the Agreement, embodying "changes" which are not material here, were made in 1959 and 1960; each of the amendments provided that, except as changed by the amendment, the Agreement should remain in full force and effect in accordance with its terms.

On January 12, 1961, in order to comply with sec. 8(d) of the Labor Management Relations Act (LMRA), 29 U.S.C.A. 158(d), and with its understanding of the terms of the existing collective bargaining agreement, plaintiff Local Union served upon defendant Chapter a written notice of its intention to terminate the existing contract in the event it could not be modified to the mutual satisfaction of the parties, and offered to meet and confer with the employer members of the Labor-Management Committee for the purpose of negotiating a new contract. Defendant Chapter acknowledged receipt of the "contract notice" and stated that it felt "certain modification of the Contract would be to our mutual benefit".

Negotiations were begun, and each party presented a proposed modified agreement or modifications to the Agreement. Neither party waived or is estopped to assert the position it now takes: the Local Union, that it had the legal right to terminate the existing Agreement as of March 31, 1961, and that it was negotiating a new Agreement; the Chapter, that the Agreement could only be terminated by mutual consent of the parties or by a decision of the Council on Industrial Relations for the Electrical Contracting Industry of the United States and Canada (Council).

To clarify the controversy, it is necessary to interrupt the chronological statement of facts and examine the structure and operations of the Council.

In 1920 IBEW and a predecessor association of employers organized the Council, and successive associations of contractors have joined with IBEW to continue it. The two member organizations are now IBEW and NECA. The basic structure, purposes, policies and rules of the Council have remained constant throughout its existence. The Council consists of six representatives from each of the member organizations, with certain alternates, to assure the presence of at least four members of each organization at all meetings, which are held regularly on the third Monday in February, May, August and November of each year. The primary purpose of the member organizations has been "to remove the causes of friction and dispute in the electrical contracting industry". A majority but by no means all of the agreements between local unions of

IBEW in the United States and chapters of NECA include clauses providing for arbitration or conciliation or both by the Council. All decisions of the Council are required to be unanimous, that is, agreed to by all representatives of IBEW and NECA present and participating. Under the heading "Policies", the official bulletin of the Council states:

"The Council differs from so-called arbitration boards in that it professes to be a court of justice and not merely a court of arbitration. It proceeds on the theory that arbitration involves compromise, which seems to mean in some minds adding up the claims of both sides of a dispute and dividing the sum by two; while judicial settlement involves the application of definite and certain principles without any accommodation between the parties.

"Emphasis should be laid upon the Council's abandonment of the philosophy of power and struggle. The Council has clothed itself with no mandatory powers and decides cases only when the disputing parties have agreed to use its services either under the terms of their collective bargaining agreement or by written stipulation at the time of submission.

"The Council has adopted the following precepts for its own guidance when acting as a conciliator in disputes:

Then follow eleven specific precepts or policies.

It is contemplated that most disputes will be submitted to the Council by both parties, namely, the local union of IBEW and the particular Chapter of NECA. However, the Council has made the following provision for unilateral submission:

"Unilateral submissions will be accepted by the Council only when all of the conditions set forth below are satisfied:

"(1) The collective bargaining agreement between the parties contains the 'Council Clause'.

"(2) The submitting party has engaged, or attempted to engage in bona fide collective bargaining in accordance with the terms of the local labor agreement in an effort to effect a local settlement.

"(3) The submitting party has notified the other party in writing of intent to file the case, and at the same time invited said other party to join in the submission.

"Upon receipt of a unilateral submission which qualifies under the conditions above set forth, together with the other material required, the secretary of the Council shall notify the nonsubmitting party that the case has been filed, and list the issues submitted to the Council."

In recent years at least, most of the disputes which have been submitted to the Council have been disputes about proposed changes in collective bargaining agreements. The parties to this case jointly submitted to the Council in 1958, 1959 and 1960 their disputes about proposed changes, agreed to accept its decision and did in fact accept it.

On February 24, 1961, plaintiff Local Union sent a formal "Notice to Mediation Agency" (FMCS Form F–7) to the Federal Agency and to the appropriate State Agency, with copy to defendant.

On March 28, the Local Union filed this suit for a declaratory judgment construing the Agreement, and upholding the right of the Local Union to terminate the Agreement as of April 1, 1961.

On March 31, plaintiff wrote defendant, referring to the notice of intention of January 11, 1961, and advising that it would consider "the Agreement terminated at the end of its present term, March 31, 1961", and that as of April 1, 1961, "no agreement exists" between the Local Union and the Chapter.

Nevertheless, negotiations between the parties continued; many of the members of the Local Union refused to work, although some remained at work.

On April 17, defendant Chapter filed a motion to dismiss the declaratory judg-

ment suit for lack of jurisdiction. That motion was denied by this court on April 20 for reasons stated in an opinion filed on April 24, 194 F.Supp. 491.

On April 21, the Chapter wrote the Local Union that "as a dispute exists on the issues before the Local-Labor-Management Committee, we are submitting these issues to the Council on Industrial Relations for the Electrical Contracting Industry for their decision. We ask that you join us in a joint submission to the Council of Industrial Relations. However, if you do not choose to submit jointly, we will by necessity file the case unilaterally." On April 25, the Local Union replied, asking what issues the Chapter intended to submit to the Council, noting that the submission was unilateral and that the Local Union wanted "to raise the question of their jurisdiction to hear the case at this time". This letter crossed a letter from the Chapter, enclosing a list of the issues it proposed to submit to the Council.[1]

On Friday, April 28, the Chapter mailed to the Council a "Submission Form" signed by the Chapter alone, and the Chapter's brief, which included the statement of facts upon which it asked the Council to decide the issues which it was submitting unilaterally. A copy was sent to the Local Union that afternoon. Under the rules of the Council the case was set for hearing on Monday, May 15, but the published rules of the Council are not clear whether any brief filed after April 30 would be considered.

At a pretrial conference held on May 4, defendant Chapter was unable to say what right the Local Union would have to file a brief after April 30. The parties were unable to agree on terms under which the matter might be submitted to the Council without prejudice to the right of the Local Union thereafter to challenge in this court the submission by the Chapter of any issues to the Council at that time and particularly the legal question whether the Local Union had the absolute right to terminate the Agreement as of March 31, 1961. The Local Union then stated that it would file at once a new complaint—Civil Action No. 13002—seeking an injunction and a temporary restraining order requiring the Chapter to cause the submission of issue to the Council to be suspended. In view of the difficult position in which both parties found themselves, it was agreed that appropriate pleadings would be filed in both suits—Civil Actions Nos. 12926 and 13002—and that both suits would be heard by the court on Wednesday, May 10.

The Chapter's answer to the complaint in No. 12926 prayed for a declaratory judgment (1) that "the question of Plaintiff's right, unilaterally, to terminate the Agreement is a 'dispute' under Section 4 of Article I of the Agreement and must be decided solely by the Council on Industrial Relations;" or, in the alternative, (2) that "the plaintiff has not or had not the right to terminate the Agreement other than by mutual agreement or through submission of the question of termination to the aforesaid council;" and (3) that "the plaintiff is obliged to abide by the expired contract until such time as a new or modified contract shall be entered into pursuant to

---

[1] "Maryland Chapter National Electrical Contractors Assn. Inc.

*Statement of Issues*

*Contractors requests per letter dated January 25, 1961*

(1) Establishment of an Industry Fund
(2) Change in work week definition
(3) Wage Rate adjustment
(4) Delete Travel Pay
(5) Modification of Referral System
(6) Letter of Agreement Changes

*Union's requests per letter dated January 24, 1961*

(1) Increase in wage (Zone rates)
(2) New Agreement
(3) Six Paid Holidays
(4) Double Time Pay for all Overtime
(5) Vacation Plan
(6) 'No Strike' or 'Work Stoppage on Jurisdictional Disputes'
(7) Increase in Health & Welfare

Since the above letters were exchanged, termination of the contract has become a dispute. (See IBEW letter dated March 31, 1961, attached.)"

the decision of the aforesaid Council". The answer was accompanied by two counterclaims: (I) seeking specific performance of Article I of the Agreement and particularly an order requiring plaintiff to submit to the Council the question of the right to terminate the Agreement; and (II) seeking (a) an injunction against "Plaintiff and its members from engaging further in any concerted stoppage of work, constituting a strike in violation of the said Agreement", and (b) damages, on behalf of its members. The Chapter answered and moved to dismiss the complaint in No. 13002.

At the trial on May 10 the facts set out above were proved. It was also proved that it is the practice of the Council on unilateral submissions to give reasonable opportunity to the non-submitting party to present evidence and argument. Some 39 cases are set for hearing before the Council on May 15. Most of them involve disputes between local unions and chapters of NECA with respect to wages and other provisions to be included in annual renewals of collective bargaining agreements. Indeed, in 1958, 1959 and 1960, and perhaps in earlier years, the parties hereto jointly submitted to the Council their disputes about proposed changes, agreed to accept the decision of the Council, and did in fact accept it. This year, however, plaintiff Local Union gave notice of termination of the Agreement as of March 31, 1961, so that it could negotiate a new contract with the Chapter by ordinary collective bargaining methods, rather than submit the disputed question of wages, working conditions and the like to the decision of the Council.

The evidence also showed that the agreements between the local unions and chapters of NECA take many different forms. A substantial number, about 100, do not include any provision for referring any disputes to the Council. The form suggested by NECA and approved, though not adopted, by the Council, contains the following sections in place of sections 1 and 2 of Article I of the Agreement involved in this case, quoted above at page 495.

"Sec. 1. This agreement shall take effect —————, 19—, and shall remain in effect until —————, 19—. It shall continue in effect from year to year thereafter, from —————, through —————, of each year, unless changed or terminated in the way later provided herein.

"Sec. 2. Either party desiring to change or terminate this agreement must notify the other in writing at least ninety days prior to —————, of any year. Whenever notice is given for changes, the nature of the changes desired must be specified in the notice. And until a satisfactory conclusion is reached in the matter of such changes, the original provisions shall remain in full force and effect. Notice by either party of a desire to terminate this agreement shall be handled in the same manner as a proposed change."

Some of the earlier agreements between plaintiff Local Union and defendant Chapter or its predecessor organizations contained sections similar to the two sections recommended by NECA. But for some reason, not shown by the evidence, the 1955 and subsequent agreements omitted the word "termination" from Section 1 and Section 2 of Article I.

It was confirmed that it is the position of defendant Chapter, supported by the Executive Vice-president of NECA, who is an alternate Co-Chairman of the Council, that such contracts as the one under consideration in this case cannot ever be terminated or changed except by the joint consent of the parties or by the unanimous approval of the employer (NECA) members of the Council as well as of the labor (IBEW) members, unless and until the Council is dissolved by the action of either IBEW or NECA.

It was also made clear that, as indicated by the statement of "Policies" quoted above, the Council considers itself

more than an arbitration board, and that the Council exercises the right "to change or substitute wording, if deemed advisable by the Council, when existing sections of agreements are submitted to the Council for interpretation as to their application or intent".

## Discussion

The construction of the Agreement and the decision of the other questions presented by the pending suits must be made in the light of the policies and principles set out in the applicable statutes and in recent decisions of the Supreme Court. Congress has not yet adopted a policy of compulsory arbitration. On the contrary, as noted by the Supreme Court in N. L. R. B. v. Insurance Agents Int'l Union, 361 U.S. 477, at page 489, 80 S. Ct. 419, 427, 4 L.Ed.2d 454: "The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized. Abstract logical analysis might find inconsistency between the command of the statute to negotiate toward an agreement in good faith and the legitimacy of the use of economic weapons, frequently having the most serious effect upon individual workers and productive enterprises, to induce one party to come to the terms desired by the other. But the truth of the matter is that at the present statutory stage of our national labor relations policy, the two factors—necessity for good-faith bargaining between parties, and the availability of economic pressure devices to each to make the other party incline to agree on one's terms—exist side by side."

It is true that sec. 203(d) of the Labor Management Relations Act, 1947, 61 Stat. 154, 29 U.S.C.A. § 173(d), states: "Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." However, the Congress "has by § 301 of the Labor Management Relations Act [29 U.S.C.A. § 185], assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, at page 582,[2] 80 S.Ct. 1347, at page 1353, 4 L.Ed.2d 1409. See also Local 201, Int'l Union of E., R. & M. W. v. General Elec. Co., 1 Cir., 283 F.2d 147; Vulcan-Cincinnati, Inc. v. United Steelworkers, 6 Cir., 289 F.2d 103.

Sec. 203(d) of the Act, 29 U.S.C.A. § 173(d), quoted above, announces a Congressional policy which favors the settlement of "grievance disputes" by arbitration and similar methods, but other sections of the Act emphasize the desirability of arriving at the "wages, hours, and other terms and conditions of employment" by collective bargaining. N. L. R. B. v. Ins. Agents Int'l Union, supra. Thus sec. 203(d) does not govern the legal question whether and how collective bargaining agreements may be terminated.

The statutory provisions with respect to termination are set out in sec. 8(d) of the Act, 29 U.S.C.A. § 158(d).[3] In

2. Again, in a footnote, the Court said: "It is clear that under both the agreement in this case and that involved in American Manufacturing Co., [United Steelworkers of Amer. v. American Mfg. Co.] 363 U.S. 564, 80 S.Ct. 1343, 4 L. Ed.2d 1403, the question of arbitrability is for the courts to decide. Cf. Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1508–1509. Where the assertion by the claimant is that the parties excluded from court determination not merely the decision of the merits of the grievance but also the question of its arbitrability, vesting power to make both decisions in the arbitrator, the claimant must bear the burden of a clear demonstration of that purpose." Ibid., 363 U.S. 583, note 7, 80 S.Ct. 1347, 1353.

3. That section provides that " * * * the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such con-

Boeing Airplane Co. v. Aeronautical Industrial Dist. Lodge No. 751, D.C.W.D. Wash., N.D., 91 F.Supp. 596, 603, Judge Carter said: "Congress expressly considered and provided for the termination of a contract containing no expiration date", quoting sec. 8(d) (1). In Boeing Airplane Co. v. N. L. R. B., 85 U.S.App.D.C. 116, 174 F.2d 988, 991, the court said: "We agree with the principle of law that a contract of indeterminate duration may become terminable by unilateral action on the part of either party after a reasonable lapse of time. In enacting Section 8(d) Congress specified what the reasonable notice of termination would be, namely, sixty days."

Defendant argues that plaintiff Local Union surrendered its right to terminate the Agreement as of March 31, 1961, upon due notice, as provided by the Act, by agreeing to the provisions of Article I of the Agreement, quoted above at the beginning of this opinion. However, the several sections of Article I do not make any reference to termination, although the word appears in the heading. They do refer to "changes", but termination and changes are different things. See N. L. R. B. v. Lion Oil Co., 352 U.S. 282, 290, 77 S.Ct. 330, 1 L.Ed.2d 331. The draft of Article I recommended by NE CA, see pp. 8–9, supra, refers to termination in secs. 1 and 2 thereof; but the similar sections contained in earlier agreements between the parties hereto were changed in 1955.[4] The provisions for reference to and eventual "decision" by the Council, contained in secs. 4 to 9 of Article I of the Agreement deal with "grievances", "proposed changes" and "disputes over matters relating to this agreement". Defendant Chapter argues that the latter phrase is broad enough to require the Local Union to submit to the decision of the Council the question whether the Local Union should be allowed to terminate the Agreement.[5]

Especially in view of the powers which the Council undertakes to exercise, as shown in the findings of fact, supra, and of the requirement that a decision of the Council must be unanimous, such a construction of Article I would be contrary to the general policy of the law, as set out in the statutes and interpreted by the Supreme Court in N. L. R. B. v. Insurance Agents Int'l Ass'n, supra, and many other cases.[6] It is also contrary to the letter of the law, as interpreted in the Boeing cases, supra. Moreover, I find that the parties did not intend that the language of Article I should be so construed.

I conclude that Article I of the Agreement does not limit the right of either party to terminate the Agreement at the end of any contract year.

The fact that in former years plaintiff Local Union joined with defendant Chapter in a voluntary submission to the Council of disputes about "changes" does not require a different conclusion. Certainly, it is highly desirable that the local unions of IBEW and the chapters of NECA take advantage of the services of

tract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;"

4. It is, therefore, not necessary to decide in this case what would be the effect of the sections as proposed by NECA.

5. And what provisions with respect to wages, working conditions and other matters should be in the Agreement.

6. Restrictions are placed upon the duration of otherwise valid and subsisting agreements in other areas of labor-management relations. E. g., the existence of a collective bargaining agreement between a union and an employer does not prevent the certification of a new collective bargaining representative during the period of the contract, Pacific Coast Ass'n of Pulp & Paper Mfgs., 42 LRRM 1477 (1958), Container Corp., 61 NLRB 823 (1945), Pittsburgh Plate Glass Co., 80 NLRB 1331 (1948); and the employer may be required to bargain with the new bargaining representative notwithstanding the terms of the subsisting agreement, American Seating Co., 106 NLRB No. 44 (1953).

the Council; the evidence shows that it has served all parties well over the years. Nevertheless, under the applicable statutory and judge-made rules, neither the Local Union nor the Chapter is precluded from exercising its legal right to terminate a collective bargaining agreement. The sufficiency of the notice is not disputed in this case.

I will enter an appropriate judgment order declaring:

(1) That the Agreement does not require that the question whether the Local Union had the right to terminate the Agreement must be submitted to the Council for its decision.

(2) That plaintiff Local Union had the right to terminate the Agreement on March 31, 1961, and did so terminate it upon proper notice.

I will deny:

(1) Defendant's prayer for a declaration that plaintiff is obliged to abide by the expired contract until such time as a new or a modified contract shall be entered into pursuant to the decision of the Council.

(2) Defendant's first counterclaim for specific performance.

(3) The specific prayers of defendant's second counterclaim.

There remain (a) plaintiff's prayer in No. 13002 for an injunction requiring defendant to take steps to cause its submission of issues to the Council to be "suspended", and (b) defendant's prayers for other and further relief contained in its second counterclaim in No. 12926.

At the conclusion of the hearing on May 11, I announced so much of my decision as is set out above,[7] and suggested that the parties agree: (1) that they will continue their collective bargaining, in good faith, as required by law; (2) that defendant Chapter will take any appeal from the judgment to be entered herein promptly, so that the case may be heard by the Court of Appeals at its June term,[8] and if the decision of this court should be reversed on appeal, the matter might be submitted to the Council at its August meeting; (3) that all members of plaintiff Local Union return to work, and continue at work during collective bargaining until the decision of the Court of Appeals on any such appeal is rendered or until July 31, 1961, if no appeal is taken from this decision. I also suggested that the parties might seek the aid of the Council as a conciliator. Both sides promptly agreed to continue collective bargaining in good faith, the Chapter agreed to take any appeal promptly, and all members of the Union present in the court room—a goodly number—agreed to return to work. Under these circumstances, I do not believe that any injunction is necessary or desirable, and I need not pass on the question what if any injunction might legally be issued.

Counsel may present a judgment order giving effect to this opinion.

---

7. Briefly, with the statement that the reasons therefor would be more fully stated in this opinion, to be filed promptly thereafter.

8. Chief Judge Sobeloff, of the Fourth Circuit, has assured me that such appeal may be heard by that Court at its June term.