John E. PARKS, Jr., et al., individually
and as representatives of the members
of Local 28, IBEW, in a class action,

v.

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS.

LOCAL UNION 28, IBEW

v.

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS.

Civ. Nos. 13235, 13359.

United States District Court
D. Maryland.

March 7, 1962.

Supplemental Opinion March 30, 1962.

Patrick A. O'Doherty and Melvin J. Sykes, Baltimore, Md., for plaintiffs in both cases.

John Henry Lewin, Baltimore, Md., Louis Sherman and Thomas X. Dunn, Washington, D. C., for defendant in both cases.

THOMSEN, Chief Judge.

These two actions against the International Brotherhood of Electrical Workers (IBEW) are brought: No. 13235, by certain members of Local Union 28, IBEW, as individuals and on behalf of all the members of Local 28, seeking to enjoin the International and its officers from revoking the charter of Local 28, from granting its jurisdiction to a new local union, and from taking other corol-

lary action; and No. 13359, by Local 28 itself, seeking a decree which would set aside the revocation of its charter, reinstate it as a local of the IBEW, enjoin the International from wrongfully interfering with the operations of Local 28 as collective bargaining agent for its members, award damages and counsel fees, and grant other and further relief.

## The Issues

Plaintiffs claim that the action of the International President (IP), later affirmed by the International Executive Council (IEC), revoking the charter of Local 28, and granting its jurisdiction to Local 24, a new local chartered immediately after the revocation, was illegal and invalid: (I) because the stated ground, that Local 28 had violated the constitution of the IBEW by engaging in a strike without the approval of the IP, was not a sufficient ground, since the strike was not the kind of strike which required the approval of the IP; (II) because, even if Local 28 had violated the constitution, (a) its charter should not have been revoked without a fair hearing before a tribunal authorized to decide the case, which was not accorded; (b) the action of the IP was a breach of the duty owed by the IP to Local 28 and its members, was illegal and against public policy, and was taken in bad faith, in that the purported ground was only a pretense for punishing the members of Local 28 for defying his wishes in connection with the collective bargaining agreement the Local was negotiating with the Maryland Chapter of the National Electrical Contractors' Association (NECA), and for having brought several suits in court against the IBEW without exhausting intra-union remedies; and (c) the action of the IP was· an unreasonably severe and unjust sanction under all the circumstances. Plaintiffs contend:

A. That the revocation of the charter was a violation of the constitution of the IBEW, which in legal effect is a contract between Local 28 and the International, and that Local 28 has a right of action for such breach of contract under sec. 301(a) of Labor Management Relations Act of 1947, as amended (Taft-Hartley), 29 U.S.C.A. § 185(a); and

B. That the revocation was (1) a violation of the rights of the members of Local 28 set out in Title I, sec. 101 of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA or Landrum-Griffin), 29 U.S.C.A. § 411, giving the members a right of action under sec. 102, 29 U.S.C.A. § 412; (2) a violation of the trusteeship provisions of Title III of the LMRDA, 29 U.S.C.A. § 461 et seq.; and (3) disciplinary action against the members prohibited by Title VI of the LMRDA, giving Local 28 and its members a right of action under sec. 609, 29 U.S.C.A. § 529, enforceable under sec. 102.

The International challenges the jurisdiction of this Court to determine any of the questions raised in either case, on the grounds (1) that the facts alleged and proved do not come within any of the jurisdictional provisions relied on by plaintiffs, (2) that all of them are within the primary jurisdiction of the National Labor Relations Board (NLRB), (3) that the relief requested is barred by the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., and (4) that plaintiffs have not exhausted their intra-union remedies by appeal to the International Convention of the IBEW.[1]

The International further contends (I) that the action of the IP, approved by the IEC, was justified under the IBEW constitution because Local 28 had engaged in a strike without the approval of the IP, in clear violation of the constitution; (II) that the action of the IP was reasonable, indeed necessary for maintaining proper union discipline, and was taken after a fair hearing and all steps required by law or by the IBEW constitution; and, finally, (III) that plaintiffs' claims are barred by their own unclean hands.

The jurisdictional questions will be considered first, so that the findings of

---

1. The Convention will be held in the Fall of 1962, a year after these suits were filed.

fact may be related to the issues properly before the Court.

### Jurisdiction

Diversity of citizenship between the parties is not claimed in either case. Nor have plaintiffs argued that jurisdiction can be sustained under 28 U.S.C.A. § 1332. Jurisdiction of the action filed by Local 28 is claimed under sec. 301 of Taft-Hartley, 29 U.S.C.A. § 185(a)[2], and of the action filed by the members (the Parks case) under several sections of Landrum-Griffin, particularly Title I, secs. 101 and 102, 29 U.S.C.A. §§ 411 and 412, Title III, secs. 302 and 304, 29 U.S.C.A. §§ 462 and 464, Title VI, sec. 609, 29 U.S.C.A. § 529.

### A.
### The Suit Filed by Local 28

Sec. 301(a) of Taft-Hartley, 29 U.S.C.A. § 185(a), provides: "Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."[3]

As this Court pointed out in 197 F.Supp. 99, at 106, the courts have not agreed as to the extent of the jurisdiction granted to the district courts by that section, but some questions are now settled, e. g. a local union is a "labor organization" within the terms of the Act.[4] It also seems to be settled that the constitution of an international union is a "contract" between the international and its members and locals.[5] The Supreme Court has just held, February 26, 1962, that the term "contracts" in sec. 301(a) should not be limited to collective bargaining agreements. Retail Clerks Int'l, etc. v. Lion Dry Goods, Inc., 82 S. Ct. 541.[6] But the courts are not agreed on what other types of contracts were intended to be covered by sec. 301(a).[7] No case brought by a local union against its parent international alone for an alleged violation of a constitution has arisen under sec. 301(a); few cases have discussed intra-union disputes, where two or more locals of the same international were in conflict.[8] In Local 33 Hod Carriers v. Mason Tenders, 2 Cir., 291 F.2d 496, the majority held that in such a case a district court should assume jurisdiction under sec. 301(a) unless there is a conflict or likelihood of conflict with the jurisdiction of the NLRB.

2. Although the complaint filed by Local 28 claims jurisdiction under both Taft-Hartley and Landrum-Griffin, it is clear and practically conceded that jurisdiction in that case must be based on sec. 301 of Taft-Hartley.

3. Both the IBEW and Local 28 are labor organizations, a substantial portion of whose members are employed in the electrical construction industry, an industry affecting commerce.

4. 29 U.S.C.A. §§ 152(5), 142(3); Local Union No. 28, IBEW v. Maryland Chapter, NECA, 194 F.Supp. 494; N. L. R. B. v. Blanton Co., 8 Cir., 121 F.2d 564; N. L. R. B. v. Indiana and Michigan Electric Co., 6 Cir., 124 F.2d 50, aff'd 318 U.S. 9, 63 S.Ct. 394, 87 L.Ed. 579.

5. International Ass'n of Machinists v. Gonzales, 356 U.S. 617, at 618, 78 S.Ct. 923, 2 L.Ed.2d 1018; Local 1104, United Electrical Radio & Machine Workers of America v. Wagner Electric Corp., E.D.

Mo., 109 F.Supp. 675; Note, 69 Yale L.J. 299, 302, especially cases cited in n. 24.

6. See also Local 33, Int. Hod Carriers v. Mason Tenders, 2 Cir., 291 F.2d 496; United Textile Workers v. Textile Workers Union, 7 Cir., 258 F.2d 743; Copra v. Suro, 1 Cir., 236 F.2d 107, 113; Snoots v. Vejlupek, N.D.Ohio, 87 F.Supp. 503. See also discussions of this point by Judge Cashin in Burlesque Artists Ass'n v. American Guild of Variety Artists, S.D.N.Y., 187 F.Supp. 393, and in the Note in 69 Yale L.J., supra. Cf. Sun Shipbuilding and Dry-Dock Co. v. Industrial Union, E.D.Pa., 95 F.Supp. 50.

7. See discussion in the majority and concurring opinions in Local 33, Hod Carriers, supra.

8. See Burlesque Artists Ass'n, supra, and the two opinions in Local 33, Hod Carriers, supra.

**292**

■■ If sec. 301(a) be taken literally, this is a suit for an alleged violation of a contract between two labor organizations representing employees in an industry affecting commerce. Although the question is not free from doubt, I adhere to my conclusion in the former suit filed by Local 28 against the International, reported at 197 F.Supp. 99, 106, that the fact that one of the organizations is an international union and the other is one of its locals does not of itself take the case outside the scope of the jurisdiction granted by sec. 301 (a). Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, and other recent cases have indicated that the federal courts should take a broad view of the jurisdiction granted by sec. 301(a) and should fashion a body of federal law from the policy of our national labor laws.

### Likelihood of Conflict with NLRB Jurisdiction

■ Local 28 has filed several charges with the NLRB against the Maryland Chapter of NECA, charging the Chapter with bargaining in bad faith in various respects, e. g. by insisting on a particular clause in the proposed new collective bargaining agreement and by conniving with officers of IBEW to coerce the members of Local 28 in the exercise of their rights protected by sec. 7 of the NLRA, as amended. The International argues that the gravamen of both actions against it is the same as those charges; that both complaints allege acts which are subject to secs. 7 and 8 of the NLRA, 29 U.S.C.A. §§ 157 and 158, and there-fore come within the exclusive jurisdiction of the NLRB under 29 U.S.C.A. § 160.

The International cites San Diego Bldg. Trade Council Mill Men's Unions v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), where the Supreme Court said: "When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." 359 U.S. at 245, 79 S.Ct. at 780.

While potential conflicts of this nature have been avoided in certain areas by ousting jurisdiction of the courts over activities which might constitute unfair labor practices subject to regulation by the NLRB, the courts have generally held that actions for breach of contract are not subject to such preemption.[9] San Diego Unions v. Garmon indicates that the principal basis for the preemption is the doctrine of primary jurisdiction, under which state and federal courts may not regulate those labor activities which Congress entrusted initially to the expertise of the NLRB. However, Congress did not entrust to the NLRB the formulation of the law of intra-union relationships. Landrum-Griffin and cases under it, as well as cases under sec. 301 of Taft-Hartley, support the view that in this area, as in the area covered by Lincoln Mills, Congress intended the federal courts to fashion and apply a body of law based upon the policy of our national labor laws.[10]

9. Textile Workers, etc. v. Arista Mills Co., 4 Cir., 193 F.2d 529; Independent Petroleum Workers, etc. v. Esso Standard Oil Co., 3 Cir., 235 F.2d 401; United Steelworkers of America v. New Park Mining Co., 10 Cir., 273 F.2d 352, 358; Lodge No. 12, etc. v. Cameron Iron Works, 5 Cir., 257 F.2d 467, 472, cert. den. 358 U.S. 880, 79 S.Ct. 120, 3 L.Ed.2d 110; Plumbers & Steamfitters Union, Local No. 598 v. Dillon, 9 Cir., 255 F.2d 820, 823; Reed v. Fawick Airflex Co., N.D. Ohio, 86 F.Supp. 822; Local Union 28, IBEW v. Maryland Chapter, D.Md., 194 F.Supp. 491, 494. See also Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp., 348 U.S. 437, 443, n. 2, 75 S.Ct. 488, 99 L.Ed. 510.

10. See cases cited in n. 9 above, and LMRDA, sec. 2, 29 U.S.C.A. § 401; Highway Truck Drivers and Helpers Local 107 v. Cohen, E.D.Pa., 182 F.Supp. 608, 617, aff'd 3 Cir., 284 F.2d 162, cert. den. 365 U.S. 833, 81 S.Ct. 747, 5 L. Ed.2d 744; Robertson v. Banana Handlers Inter. Longshore. Ass'n, E.D. La., 183 F.Supp. 423; Detroy v. Ameri-

In International Association of Machinists v. Gonzales, 356 U.S. 617, 78 S. Ct. 923, 2 L.Ed.2d 1018 (1958), decided before the enactment of Landrum-Griffin, the Supreme Court held that the protection of union members in their contractual rights as members had not been undertaken by federal law, and that state power to order reinstatement in a union was not precluded by the fact that the union's conduct might also involve an unfair labor practice and that there was a remote possibility of conflict with enforcement of national policy by the NL RB. A fortiori, the rights of action given to labor organizations by sec. 301(a) of Taft-Hartley should not be narrowly construed and rendered ineffective because of a remote possibility of conflict with NLRB jurisdiction. See Lincoln Mills and Local 33, Hod Carriers, supra.

This Court has no jurisdiction to decide whether the Maryland Chapter failed to bargain in good faith. And insofar as Local 28's complaint against the International is based upon a claim that the International conspired with and encouraged the Maryland Chapter not to bargain fairly, the complaint alleges an activity at least arguably subject to secs. 7 and 8, and therefore subject to the primary jurisdiction of the NLRB.[11]

On the other hand, insofar as Local 28's case is based upon a construction of the IBEW constitution, or upon the claimed failure of the International to afford Local 28 a fair hearing before a proper tribunal on the charge against it before its charter was revoked, or upon the alleged breach of duty, bad faith and legal malice of the IP in revoking the charter for punitive reasons while pretending to do so for other, proper reasons, or upon the alleged unreasonableness or injustice of his action, Local 28's claims in this case are not within the primary jurisdiction of the NLRB.

### The Norris-LaGuardia Act

■ Defendant argues that the Norris-LaGuardia Act prevents the injunctive relief sought by Local 28.[12] Sec. 1 of that Act, 29 U.S.C.A. § 101, provides: "No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter."

The problem of accommodating the Norris-LaGuardia Act to sec. 301 of the Taft-Hartley Act has been the subject of much discussion.[13] The courts have

can Guild of Variety Artists, 2 Cir., 286 F.2d 75, 78, cert. den. 366 U.S. 929, 81 S. Ct. 1650, 6 L.Ed.2d 388. Moreover, as pointed out in 69 Yale L.J. 309, at 318, "legislative history indicates that the NLRB, and not the courts, is to withdraw from areas of potential conflict between unfair-labor-practice and breach-of-contract proceedings. The conference committee rejected proposals which would have rendered both breach of contract and violation of arbitration agreements an unfair labor practice, because it feared that NLRB administration in this area might interfere with judicial remedies and decisions under section 301." See H.R.Conf. Rep. No. 510, 80th Cong., 1st Sess., 41–42, 52 (1947) in 1 Leg.Hist. of LMRA, 545–46, 556; S. Minority Rep. No. 105, 80th Cong., 1st Sess., 13 (1947) in 1 Leg.Hist. of LMRA, 475, 93 Cong.Rec. 6600 (1947)

—statement on Senate floor by Senator Taft in 2 Leg.Hist. of LMRA 1539.

11. Nor can a claim that the International attempted to coerce the members of Local 28 in the exercise of the rights protected by sec. 7 be properly presented by Local 28 in its case, whether or not the members may be entitled to press the point in their case. See discussion under B below.

12. That Act could not affect this Court's jurisdiction to award damages.

13. See e. g. Labor Injunctions and Judge Made Labor Law, 70 Yale L.J. 70, at 94 et seq.; Accommodation of the Norris-LaGuardia Act to Other Federal Statutes, 72 Harv.L.Rev. 354, at 364, et seq. The problem is now before the Supreme Court in a different context. Chauffeurs, Teamsters & Helpers Local Union No. 795 v. Yellow Transit Freight

held that although Norris-LaGuardia is broad, it is not all-embracing. In Lincoln Mills, supra, the Supreme Court noted that the kinds of acts which had given rise to abuse of the power to enjoin are listed in sec. 4 of the Act, 29 U.S.C.A. § 104, and that failure to arbitrate was not a part and parcel of the abuses against which the Act was aimed. Although the Court felt that a literal reading might bring the dispute within the terms of Norris-LaGuardia, it saw no justification in policy for restricting sec. 301(a) of Taft-Hartley to damage suits. The Court cited Virginian R. Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Graham v. Brotherhood of Firemen, 338 U.S. 232, 237, 70 S.Ct. 14, 94 L.Ed. 22, and Syres v. Oil Workers International Union, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785, to show that the Norris-LaGuardia Act does not deprive federal courts of jurisdiction to issue injunctions to compel compliance with the mandates of the Railway Labor Act, or to prevent racial discrimination in the application of collective bargaining agreements. 353 U.S. at 458, 77 S. Ct. 912.

In the only cases cited or found which were brought by members of a labor organization against other members of their own organization, dealing with intra-union difficulties, the Norris-LaGuardia Act was held not to bar injunctive relief. Tisa v. Potofsky, S.D. N.Y., 90 F.Supp. 175; Chambers v. International Hod Carriers' Building, etc., D.D.C., 52 F.Supp. 978; Bowe v. Judson C. Burns, Inc., E.D.Pa., 46 F.Supp. 745, 747, aff'd on other grounds, 3 Cir., 137 F.2d 37.[14] The cases cited by defendant are distinguishable.[15]

This case does not come within any of the classes set out in sec. 4, in which injunctions are absolutely prohibited.[16] The question whether the case proved by the facts involves or grows out of a "labor dispute", within the meaning and intent of that term as used in sec. 7 and defined in sec. 13, 29 U.S.C.A. §§ 107 and 113, will be decided under the heading "Relief" after the facts have been found and discussed.

### Exhaustion of Remedies

Defendant also contends that Local 28's suit is barred because it has not exhausted its intra-union remedies by appealing to the International Convention, which meets in September 1962.

In the earlier suit filed by Local 28 against the International in July 1961, this Court held, for reasons stated in 197 F.Supp. at 107, 108, that it would not grant relief to Local 28 until after

Lines, Inc., 10 Cir., 282 F.2d 345, cert. granted 364 U.S. 931, 81 S.Ct. 378, 5 L. Ed.2d 364; Sinclair Ref. Co. v. Atkinson, 7 Cir., 290 F.2d 312, cert. granted 368 U.S. 937, 82 S.Ct. 376, 7 L.Ed.2d 336. See also Charles Dowd Box Co., Inc. v. Courtney, et al., 82 S.Ct. 519.

14. See also Textile Workers Union v. American Thread Co., D.Mass., 113 F. Supp. 137, 142, cited with approval in Lincoln Mills.

15. They fall into two general categories, different from the cases at bar: (1) Jurisdictional disputes—e. g. Green v. Obergfell, 73 App.D.C. 298, 121 F.2d 46, 138 A.L.R. 258, cert. den. 314 U.S. 637, 62 S.Ct. 72, 86 L.Ed. 511; Fur Workers Union Local No. 72 v. Fur Workers Union, 70 App.D.C. 122, 105 F.2d 1, aff'd per curiam 308 U.S. 522, 60 S.Ct. 292, 84 L. Ed. 443; Duris v. Phelps Dodge Copper Products Corp., D.N.J., 87 F.Supp. 229;

Fitzgerald v. Haynes, D.C.Pa., 146 F. Supp. 735, aff'd 241 F.2d 417. (2) Cases involving the issue whether a federal court exercising its jurisdiction under sec. 301 may enjoin a work stoppage in breach of a collective bargaining agreement— e. g. W. L. Mead, Inc. v. International Broth. of Teamsters, 1 Cir., 217 F.2d 6; A. H. Bull Steamship Co. v. Seafarers' Internat'l Union, 2 Cir., 250 F.2d 326, cert. den. 355 U.S. 932, 78 S.Ct. 411, 2 L. Ed.2d 414; Alcoa S.S. Co. v. McMahon, 2 Cir., 173 F.2d 567, cert. den. 338 U.S. 821, 70 S.Ct. 65, 94 L.Ed. 498; Chauffeurs, Teamsters and Helpers Union, Local 795, v. Yellow Transit Freight Lines, Inc., 10 Cir., 282 F.2d 345, cert. granted, 364 U.S. 931, 81 S.Ct. 378, 5 L.Ed.2d 364; Sinclair Ref. Co. v. Atkinson, 7 Cir., 290 F.2d 312, cert. granted, 368 U.S. 937, 82 S.Ct. 376, 7 L.Ed.2d 336.

16. Sec. 7 of the Act, 29 U.S.C.A. § 107, will be discussed below under "Relief".

the decision of the IEC, to which Local 28 had already appealed at the time the motion for preliminary injunction came before this Court in August 1961. This Court did not decide whether a further appeal to the Convention would be required.

The IEC heard the case and rendered its decision in September 1961, affirming the action of the IP revoking the charter of Local 28. To require a further appeal to the Convention would mean that the right of Local 28 to bring this suit would be delayed for a year after the decision of the IEC. The four month limit in sec. 101(a) (4) of Landrum-Griffin, 29 U.S.C.A. § 411(a) (4), does not control this action brought by Local 28 under Taft-Hartley, but it is a helpful guide. In view of the issues raised by the complaint and the public interest in obtaining a prompt settlement of the entire matter, I conclude that the delay inherent in an appeal to the Convention would be unreasonable. See Detroy v. American Guild of Variety Artists, 2 Cir., 286 F.2d 75, 79, cert. den. 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388; Summers, Union Discipline, 70 Yale L.J. 175, at 207, and 197 F.Supp. at 107.

B.

*The Parks Case*

Plaintiffs allege that their rights as members of IBEW under the Bill of Rights in Landrum-Griffin, sec. 101(a) (1), (4) and (5), 29 U.S.C.A. § 411(a) (1), (4) and (5), have been violated. If the evidence shows that rights secured by those provisions have been infringed, plaintiffs are entitled to appropriate relief, including an injunction, in this civil action brought under 29 U.S.C.A. § 412.

Plaintiffs also contend that the revocation of the charter of Local 28 was intended to be and was disciplinary action against the members of Local 28 for exercising rights to which they are entitled under Landrum-Griffin; and that they therefore have a right of action under sec. 609 of that Act, 29 U.S.C.A. § 529, enforceable under 29 U.S.C.A. § 412. Again, this Court has jurisdiction to grant relief if the evidence supports the charge.

Plaintiffs' other claim of jurisdiction is based upon Title III of Landrum-Griffin, 29 U.S.C.A. § 461 et seq., dealing with trusteeships. They contend that the revocation of the charter of Local 28 was in effect another "method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or by-laws", within the meaning of sec. 3(h) of that Act, 29 U.S.C.A. § 402(h), and that this Court has jurisdiction over their attack on such revocation under secs. 301–304, 29 U.S.C.A. §§ 461–464.[17]

It is possible for revocation to be used as a means of evading the trusteeship provisions in sec. 301 et seq. But the evidence in this case does not support the contention that it was so used. It is therefore unnecessary to pass on the question whether and to what extent a federal court may grant relief where an evasion of the trusteeship provisions is shown.

The fiduciary responsibilities of officers dealt with in Title V of the Act, sec. 501 et seq., 29 U.S.C.A. § 501 et seq., are primarily if not entirely pecuniary. But the broad declaration in the first sentence of sec. 501(a)—"The officers, agents, shop stewards, and other repre-

---

17. Plaintiffs cited Horowitz, Possible Effects of LMRDA's Provisions in "Symposium on the Labor-Management Reporting and Disclosure Act of 1959", edited by Slovenko, 458, 563: "And the problem of locals that are troublesome to the national can also be easily handled in a variety of ways. National officers need not resort to trusteeships to punish local union officials or the local un-

ions because of political opposition to the national office. Under most constitutions the national officers may legally suspend a local or lift its charter for a variety of very general reasons. * * * If the illegitimate purposes of trusteeships can be accomplished by other means, how effective are the trusteeships provisions of LMRDA?"

sentatives of a labor organization occupy positions of trust in relation to such organization and its members as a group."—emphasizes the nature of the officers' duty, which is not limited to pecuniary matters.

### Possible Conflict with NLRB Jurisdiction

[7] This challenge to the jurisdiction of the Court is unavailing in the Parks case. As Judge J. Skelly Wright said in Robertson v. Banana Handlers Inter. Longshore. Ass'n, E.D.La., 183 F.Supp. 423, at 426: "In short, though the Taft-Hartley Act gives the expelled union member a cause of complaint to the NLRB if he is subsequently discriminated against, it grants him no redress against arbitrary expulsion itself. This is, in effect, the ruling of the Supreme Court in International Ass'n of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018, in which the state court action brought by expelled machinists for reinstatement to membership in the union and damages was held proper on the ground that the Taft-Hartley law afforded them no adequate remedy under the circumstances. Thus, it seems clear that no federal law before Section 101 of the 1959 Act protected the worker against improper disciplinary action by his union. Since the complaint here involves only that provision of the new law, we need go no further to conclude that the 'Bill of Rights' of the 1959 Act created a new substantive right, at least as far as the federal law is concerned.

\* \* \* \* \* \*

"There being no pre-existing right under state or federal law, it must be concluded that Title I of the 1959 Act, at least so far as the provisions relating to disciplinary action are concerned, not only gave a new remedy, but conferred a new substantive right on members of labor organizations, and imposed a corresponding new liability on the union and its officers. \* \* \* "

### The Norris-LaGuardia Act

■ That Act does not apply to the Parks case because the Landrum-Griffin Act specifically authorizes injunctive relief. Sec. 102, 29 U.S.C.A. § 412.

### Exhaustion of Remedies

Failure of Local 28 or of plaintiffs in the Parks case to appeal to the International Convention is no bar to the maintenance of the Parks case, whatever construction is placed on 29 U.S.C.A. § 411 (a) (4). See Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.R. 819, at 839–841. The year's delay involved in such an appeal would be unreasonable. See discussion under A supra.

### MERITS

#### Objections to Evidence

A great mass of evidence was offered by plaintiffs, much of it over the objection of defendant, in an effort to prove that the IP acted for illegal and punitive reasons, and in collusion with officers of NECA. Defendant also offered a great deal of evidence to meet plaintiffs' charges and to prove the customary practices of labor unions, the history of the controlling provisions of the IBEW constitution, and the development of the so-called "Council clauses" in the agreements between locals of the IBEW and chapters of NECA. Many of the items offered furnish only slight additional candlepower to aid a search for the essential facts, but it is hard to say that any item has no probative value at all on the issues before the Court. I have overruled all of the objections, but have given each item of evidence only the weight to which it is entitled.[18]

#### Evidence in Former Cases

It would be impractical to set out all the relevant facts in this opinion; indeed the decision of this case would be unreasonably delayed if I undertook to rule on every proposed finding of fact. Sev-

18. The Court must regretfully note the untrustworthy character of much of the evidence, including the minutes of many meetings as well as the testimony of many of the witnesses.

eral important documents proved in the instant case are quoted at length in the opinions of this Court in two former suits filed by Local 28, namely, Local Union No. 28 v. Maryland Chapter, NECA, 194 F.Supp. 494 (1961), and Local Union No. 28 v. International Bro. of Elec. Wkrs., 197 F.Supp. 99 (1961). It will be convenient to consider certain portions of those opinions as adopted by reference herein, and to refer to them in the discussion of the various points to be considered. Some of the conclusions or inferences drawn in the earlier opinions will have to be modified because of the additional evidence in this case; and it should be noted that the earlier complaint of Local 28 against the International was dismissed *without prejudice*. 197 F. Supp. 99, 107–08.

## FACTS

IBEW has over 750,000 members, of whom 150,000 are in the electrical construction industry; others are employed by power companies, manufacturing companies, and the like. Its local unions in the United States and Canada have nearly 800 working agreements with chapters of NECA and a few other groups of employers in the electrical contracting industry. Most of the material provisions of the constitution of the IBEW are set out in 197 F.Supp. at 102, n. 2.

Local 28 was chartered in 1900; as of June 1, 1961, it was the uncertified collective bargaining agent for its 1,400 members, most of whom were employed in the electrical construction industry in the Baltimore area.[19] Over the years it has entered into successive collective bargaining agreements with the Maryland Chapter of NECA.

Art. XVII, sec. 7, of the IBEW constitution requires that all such agreements be submitted to the IP, and that they "shall be null and void without IP approval. The IP has the right to correct any by-laws, amendments, rules or agreements to conform to this Constitution

and the policies of the I.B.E.W.". The 1958 International Convention refused to eliminate the reference to "policies".

### Council Clauses

For many years it has been a policy of the IBEW to discourage strikes, and to encourage its locals to include in their collective bargaining agreements with local chapters of NECA a "Council clause", requiring the parties to submit to the Council on Industrial Relations for the Electrical Contracting Industry of the United States and Canada (the Council), a bi-partite group set up by IBEW and NECA, all disputes between the local and the chapter.

The Council is not an arbitrator, as the term is generally used today, but it is a part of the collective bargaining process, at a higher level, claiming and exercising the power to write contracts for the locals and the chapters as it sees fit. For a brief statement of the history, operation and policies of the Council, see 194 F.Supp. at 494–497.

The Council clauses in the various agreements differ in important respects, and some of the larger locals have refused to adopt them, but most of the locals have in their agreements clauses requiring the submission to the Council not only of disputes about working conditions and the like during the term of an agreement, but also proposed changes in wages and working conditions at the end of any contract year, if the local labor-management committee is unable to reach an agreement.

Since the collective bargaining agreements usually provided that they should continue in effect from year to year, unless changed as provided therein, it was generally but not universally believed that such agreements were "evergreen" contracts, i. e. perpetual agreements terminable only by mutual agreement, by permission of the Council, or upon the possible dissolution of the Council by IBEW and NECA. Some of the agree-

---

19. Embracing Baltimore City, and Anne Arundel, Baltimore, Caroline, Carroll, Frederick, Harford, Howard, Kent, Queen Anne's and Talbot Counties in Maryland.

ments contained language stating more or less clearly that disputes with respect to termination, as well as with respect to proposed changes, were matters which had to be submitted to the Council. Others made no reference to termination, and from time to time arguments arose about the proper construction of the less clear agreements. So some of the leaders of IBEW or NECA or both prepared, the Council approved, and NE CA distributed to its chapters in 1959 on yellow sheets a "Council clause", really a series of sections, which, if included in an agreement, would make it quite clear that "Notice by either party of a desire to terminate the agreement shall be handled in the same manner as a proposed change". In other words, under that clause, a unilateral attempt to terminate is a dispute which must be referred to the Council.

Only 20 agreements out of nearly 800 contain the recommended clause. Moreover, the evidence shows that in only two instances was the "yellow sheet" Council clause voluntarily adopted; in the other 18 instances it was imposed by the Council itself. The evidence in this case also shows that by formal action taken by the Council shortly after Freeman became IP of IBEW, but not communicated by him even to all the other offcers and international representatives of IBEW, much less to the locals, it was agreed that whenever the question of the right to terminate an agreement was presented to the Council, the Council would impose upon the parties the "yellow sheet" clause, which binds the parties tightly unless it is illegal.

The legality of such a clause was discussed in Local Union No. 28 v. Maryland Chapter, NECA, 194 F.Supp. at 500–501. This Court believed that such an "evergreen" clause violates the general policy of the law, as set out by the Supreme Court in N. L. R. B. v. Insurance Agents Int'l Union, 361 U.S. 477, at 489, 80 S.Ct. 419, 4 L.Ed.2d 454, and other cases, and violates the letter of the law, as interpreted in Boeing Airplane Co. v. Aeronautical Industrial Dist.

Lodge, No. 751, W.D.Wash., 91 F.Supp. 596, 603, and Boeing Airplane Co. v. N. L. R. B., 85 U.S.App.D.C. 116, 174 F.2d 988, at 991. But since the wording of the agreement between Local 28 and the Maryland Chapter, involved in the case then before the Court, was different from the wording of the "yellow sheet" clause, and since the Court found that the wording of the Maryland agreement did not limit the right of either party to terminate that agreement at the end of any contract year, it was not necessary for the Court to make a final ruling on the validity of the tight, evergreen "yellow sheet" Council clause. See 194 F.Supp. at 501.

## Conflicts Between Local 28 and the International Before 1961

Since 1958 there have been two warring factions in Local 28, one led by Eveson and Beckhardt, the other by King and Rost. In the summer of that year Eveson was elected president, but King and Rost were reelected business manager and financial secretary, respectively. In an effort to bring the financial affairs of the Local into line with the IBEW constitution, and to prevent the depletion of the Local's funds, Eveson took action which resulted in charges and countercharges heard and decided by the International officials and the imposition of a trusteeship on Local 28. Goidel, the trustee, ruled with an iron hand, sided with the King faction, removed Eveson from office, increased the ratio of apprentices to journeymen, and proposed an increase in dues and assessments, which he submitted to the membership in a referendum felt to be unfair by most of the members. After attempting to have the referendum withdrawn, but without exhausting their intra-union remedies, some of the members of Local 28 filed an action in this Court to block the proposal which had received the largest number of votes. Most of the members had abstained from voting, so the IP refused to put the proposal into effect, and the court action was dismissed by stipulation.

In March 1960 some of the members requested a return of autonomy to the Local and a new election of officers, to which Goidel responded by filing charges against the members who had sued to set aside the referendum.[20] Counsel for the IBEW helped prepare the charges. The executive board of Local 28 thereupon filed suit in this Court under the Landrum-Griffin Act to set aside the trusteeship, and the members charged by Goidel filed a suit to enjoin the prosecution of the charges. A motion to dismiss the complaint filed by the executive board was overruled by Judge Watkins, Executive Board, etc. v. IBEW, D.Md., 184 F. Supp. 649.[21] The charges against Eveson et al. were heard by the IEC on June 17, 1960, the trusteeship was terminated by order of the IP dated June 30, effective August 5, Eveson was promptly reelected president of Local 28, Beckhardt was elected business manager, and the IEC disposed of the charges with a finding of mitigating circumstances. The actions in this Court, having become moot, were closed out in December 1960.

From August 1960 until March 1961 the relations between Local 28 and the International officers were apparently friendly.

*Collective Bargaining—Local 28 and the Maryland Chapter of NECA*

Over the years Local 28 and the Maryland Chapter had entered into a series of collective bargaining agreements which had contained clauses providing for the reference of disputes to the Council. These clauses had varied from time to time, for reasons which are not clear. No dispute with respect to wages was referred to the Council by either Local 28 or the Maryland Chapter between 1922 and 1958. In 1958, 1959, and 1960 the Local and the Chapter submitted wage disputes to the Council, which granted an increase in each instance,

not as large as the Local wanted, but not unfair or unreasonable under all the circumstances, including the wage rates of comparable building trades in Baltimore, where unions are not as strong as in Philadelphia, Wilmington and Washington.

The March 7, 1958 agreement between Local 28 and the Maryland Chapter contained the provisions set out in 194 F. Supp. at 496–97.

In January 1961 Local 28 gave notice to the Maryland Chapter of its intention to terminate the existing agreement in the event it could not be modified to the mutual satisfaction of the parties. Negotiating committees were appointed and met, but the parties were unable to reach an agreement on wages. Local 28 demanded 35¢ for the first year and sought comparable amounts for two years thereafter. The Chapter began with an offer of 2¢ for the first year, which it gradually raised to 20¢ in two instalments during the first year and smaller raises in later years, after the June strike. In February Local 28 gave the Federal Mediation Service notice of the proposed termination or modification of the existing collective bargaining contract and notice that a dispute existed with the other party to the contract.

The Maryland Chapter took the position that the contract could not be terminated unilaterally without the approval of the Council. So, on March 28, 1961, Local 28 filed suit against the Chapter in this Court, seeking a declaratory judgment as to its right to terminate the agreement by unilateral action. On March 31 the Local gave formal notice to the Chapter that it was terminating the agreement as of that date. There had been little communication between Local 28 and the International officers up to March 31, but the Local reasonably felt that it had the support of the Interna-

20. Art. XXVII, sec. 1, of the International constitution provides for automatic expulsion for bringing court proceedings at any time before exhausting remedies in all the courts of the defendant Brotherhood.

21. That opinion sets out at length the allegations of the complaints, many but not all of which I find to be supported by the evidence in the instant cases.

tional in its efforts to obtain a substantial increase, although International Representative Adams told them in April that they were "shooting for the moon".

Early in April, with the knowledge and approval of the IP, Sherman, the IBEW attorney, met with a NECA official and the attorneys for and the manager of the Maryland Chapter, to discuss the declaratory judgment suit. The International did not tell Local 28 of this meeting, or of several subsequent private meetings between officers and attorneys of the International and officers and attorneys of NECA, hereinafter mentioned.[22]

Commencing on April 25 about half of the members of Local 28 went out on strike, without a formal strike vote. Local 28 had not asked for nor received permission to strike from the IP. The attorneys for Local 28 describe this as a wildcat strike, but I find that it was subject to the control of Eveson and Beckhardt, the president and business manager of Local 28, and of O'Doherty, its attorney, who more and more assumed the leadership and direction of the Local.

On or about April 28, while it was offering 5¢ for the first year, the Chapter filed a unilateral submission to the Council, which was to meet on May 15. See 194 F.Supp. at 498, particularly n. 1. Local 28 thereupon filed another suit in this Court to enjoin any decision by the Council of this unilateral submission. That suit was consolidated for trial with the declaratory judgment suit, and they were heard in this Court on May 10–11.

At the conclusion of the hearing on May 11, this Court announced its decision that the agreement did not require that the question whether the Local had the right to terminate the agreement must be submitted to the Council for its decision, and that the Local had the right to and did terminate the agreement on

March 31, 1961. See 194 F.Supp. at 502. This Court suggested that the parties agree: "(1) that they will continue their collective bargaining, in good faith, as required by law; (2) that defendant Chapter will take any appeal from the judgment to be entered herein promptly, so that the case may be heard by the Court of Appeals at its June term, and if the decision of this court should be reversed on appeal, the matter might be submitted to the Council at its August meeting; (3) that all members of plaintiff Local Union return to work, and continue at work during collective bargaining until the decision of the Court of Appeals on any such appeal is rendered or until July 31, 1961, if no appeal is taken from this decision". 194 F.Supp. at 502. This Court also suggested that the parties might seek the aid of the Council as a conciliator. Both sides promptly agreed to continue bargaining in good faith, the Chapter agreed to take any appeal promptly, and all members of the Union present in the court room—a goodly number—agreed to return to work.

Prior to May 13 the Chapter's last offer had been a 5¢ increase for the first year, 5¢ for the second and 10¢ for the third. On May 13, 1961, after the Court's oral opinion, the negotiating committee met and discussed a substantially higher wage increase. Local 28 reported this to the IP.

On May 15 the Maryland Chapter's unilateral submission came on for hearing before the Council. Geary, the chief executive of NECA, disqualified himself on the record, but was present part of the time. Freeman, IP of IBEW, presided at the hearing and the deliberations. Local 28 did not appear or participate, but sent a letter to the Council explaining its reasons for not submitting to unilateral arbitration before the

22. As this Court has pointed out on a number of occasions, the officers of the International and of NECA have a common interest in the Council as a means of stabilizing labor relations in the industry, which renders a large measure of cooperation between the two national organizations reasonable and desirable. But the officers of IBEW must not forget their duty to the individual locals and members.

Council. Representatives of the Maryland Chapter appeared and asked the Council not to make a binding determination, but to make a recommendation in keeping with this Court's oral opinion of May 11.[23]

Freeman was very angry when he read the letter from Local 28 and heard the proposal of the Maryland Chapter. He directed the Chapter to proceed with the presentation of its case. After the public hearing the members of the Council met in executive session for an hour and a half. The minutes of the meeting, approved at a later meeting, state that the Council reached a decision on that day. Nevertheless, several members of the Council testified that no decision was reached, but that one of the NECA members made a motion, not seconded, to allow the Local 10¢ for one year. No witness admitted he could remember a word spoken by Freeman or any other IBEW member, nor what position they took. The Treasurer of the Council prepared a memorandum of a decision allowing a 10¢ increase, which was typed and sent to counsel for NECA and counsel for IBEW for their suggestions as to appropriate language to be included to conform to the Court's opinion.

I find that a tentative decision was reached on May 15 as to the 10¢ increase, to which Freeman gave his approval. It is quite incredible that a draft of a decision would have been prepared and circulated without his consent. I do not believe the testimony to the contrary. The May 20 minutes show that the matter of the Maryland decision was referred to the executive committee of the Council to "review, revise or take such other action as may be deemed necessary with the language and effective date of the Council's decision reached in the Baltimore case, prior to its being released" (sic). On June 2 the Council, through its executive committee, filed a "Decision", stating that in view of the pending litigation, no decision should be issued.

In the case at bar Local 28 has failed to prove that news of the 10¢ tentative decision was communicated to the Maryland Chapter, and the International has failed in its impossible attempt to prove the negative. Perhaps by coincidence, on May 18 the Maryland Chapter raised its offer to 10¢ for the first year, 10¢ for the second year, and 5¢ for the third.

On May 19 the Maryland Chapter took an appeal from the decision of this Court, but after conferences between the attorneys for the IBEW, the attorneys for NECA and the attorneys for the Maryland Chapter it was decided that the appeal should be dismissed, because the attorneys were agreed that there was small chance of success and feared that a decision on appeal might be rested on broader grounds, evidently that any "evergreen" clause, especially the "yellow sheet" clause, would be illegal.

Meanwhile, Freeman and Geary had been in conference, and Freeman had assurd Geary that if the appeal was dismissed he would do everything he could to see that the Local submit to the Council all issues regarding the terms and provisions of a new contract which could not be resolved by bargaining between the Local and the Maryland Chapter. Geary thereupon sent a representative to Baltimore to advise the Maryland Chapter as to the position it should take in negotiations with the Local, apparently to advise the Chapter to ask for the "yellow sheet" Council clause in the new contract. The Maryland Chapter did so at the next bargaining session; thereafter the demand for such a clause was an issue in the bargaining, second only to Local 28's continued demand for 35¢ for the first year.

### The June 16 Strike

The leaders of Local 28 were determined to strike if they could not obtain their demands by negotiation. On June 2 the Local voted that within a period of 48 hours after the decision on appeal, the business manager should call a meeting on the subject of "strike or not."

23. The Court's written opinion, 194 F. Supp. 494, was filed on May 16, 1961.

On June 9 the Chapter dismissed its appeal. On June 13 the Local voted 740 to 79 to strike, work to cease at 4 p. m., Friday, June 16. Before the vote was taken, one of the members of Local 28 asked if permission to strike had been given by the IP. The business manager, Beckhardt, answered in the affirmative, stating falsely that the Local had been given a "green light". On June 14 the Local notified the IP of the vote by telegram, and said: "Any instructions from you would be appreciated."

The IP promptly replied by telegram on June 15 that any strike without his consent would be in violation of the IBEW constitution, and that he was refusing his consent in this case. He testified that he refused his consent ·because the Local was violating the suggestions of the Court;[24] because his consent had not been asked in advance;[25] because it was a general policy of the IBEW to favor the reference of all disputes to the Council, where there was a Council clause in the contract;[26] and because he felt they could negotiate a Council clause that was agreeable to both sides.[27] I find that the IP was also and primarily moved by a desire to acquire and retain as much control as he could over the negotiations with the Maryland Chapter, because he distrusted Eveson, Beckhardt and O'Doherty and other leaders of the group that controlled Local 28, as the result of the previous difficulties, in which, however, the fault did not all lie on one side. He was also angry with the leaders of Local 28 because they had sued IBEW without exhausting their intra-union remedies. He stated publicly that he "hated" the Landrum-Griffin Act because it protected access to the courts by union members. The telegram was received by the executive board of Local 28 before the strike began, but it was not brought to the attention of the members of the Local.

Shortly after the strike began, Local 28 entered into interim agreements with

24. The Court contemplated either no appeal or a ·decision of the Court of Appeals, not the possibility of an appeal being taken and dismissed. Counsel for the International now makes the surprising charge that Local 28 was violating the Court's suggestion by not bargaining fairly with the Maryland Chapter and was moved by "inflexible cupidity" in its desire to secure a 35¢ increase. No such point was made by the IP at the time. Such an increase would have brought Local 28's scale about in line with neighboring cities, although it may have been unrealistic in view of the strong non-union situation in Baltimore. In view of the pending proceedings before the NLRB, I intimate no opinion whether either the Local or the Maryland Chapter failed to bargain fairly, beyond my decision that in refusing his consent, the IP did not rely upon any such failure on the part of Local 28.

25. It was proved that the IP did not ordinarily refuse his consent for this reason. The evidence shows that locals frequently do not ask permission to strike until after a strike vote has been taken and that the IP usually grants such permission after a short investigation by an IVP or an International representative.

26. He overlooked the fact that this Court had held that the contract had been terminated, that the appeal from that decision had been dismissed, and that the Council itself had held, "in view of the pending litigation involving the Maryland Chapter, NECA, and Local Union No. 28 that no decision should be issued". The IP had given his consent to a number of strikes where a Council clause appeared in the contract, but it is impossible to tell whether the IP believed in good faith that the circumstances were so different as to permit or require different action by him.

27. This is inconsistent with the understanding with respect to the "yellow sheet" clause and his conversation with Geary on June 2, neither of which had been brought to the attention of Local 28. Counsel for IBEW argue that the IP did not intend to force an "evergreen" clause on Local 28, and cites as support for his argument the fact that such a clause was eliminated from the collective bargaining agreements of Local 70 (Washington, D.C., with jurisdiction over Montgomery, Prince George's and other Maryland counties) and from the agreement entered into by Local 24 immediately after its organization. These eliminations were made two months or so later, and do not persuade me of the IP's intentions in June.

a dozen or so contractors, including at least one NECA member, providing for a wage increase of 35¢.[28]

On June 19 officers of the Local wrote the IP, and on June 20 saw him personally, telling him about the charges they were filing with the NLRB against the contractors, which alleged failure to bargain in good faith, about their success in dealing with individual contractors, and about their hopes for a successful outcome of the strike. The IP stated that he wished them well in their negotiations, but that he wanted any unresolved issues to be submitted to the Council. He refused to consent to the strike, and the officers of the Local agreed that a meeting of the Local would be held on June 22, and that the IP's telegram of June 15 would be read to the membership. This was done by O'Doherty, who stated that he disagreed with the IP's construction of the constitution and asked for a vote of non-concurrence, which was given.[29]

Meanwhile the IP had assured Geary that he would assist the NECA contractors to obtain union employees. Some men were brought to Baltimore from other cities; at the same time some of Local 28's members went to other cities to work. The IP told other unions in the building trades that Local 28's picket lines need not be honored.

On July 6 the Maryland Chapter broke off negotiations with Local 28 on the ground that the Local was not bargaining in good faith. Pious protestations were made by both sides.

*Revocation of Local 28's Charter*

On July 7 the International served on Local 28 charges, prepared by the IBEW counsel and signed by the IP, requiring the Local to show cause why its charter should not be revoked for engaging in a strike without the consent of the IP, as required by Art. XVII, sec. 13, of the constitution. An independent referee was appointed under Art. IV, sec. 11, of the constitution, to take testimony, make findings of fact and report to the IP, but the IP reserved to himself the decision of all questions of constitutional interpretation, and scheduled an argument before himself on all issues of law and fact, to be held after the referee submitted his report. Local 28 requested an opportunity to examine the IP and certain other officers and International representatives, but the IP refused to appear, because as he later testified: " * * * in the final analysis I would have to make a decision on the case".

On July 12 the Local suggested to the IP that the terms of the new contract be referred to an independent arbitrator, but the IP refused and said that the only way Local 28 could avoid disciplinary proceedings would be to return its members to work and submit all unresolved issues to the Council. He refused to give the Local any assurance that it would not be forced to accept the "yellow sheet" clause but did not tell them of the policy of the Council with respect to that clause.

On July 17 the Local filed an action in this Court against the IBEW and the IP, making the allegations and requesting the relief set out in 197 F.Supp. at 101–104.

The hearings before the referee were held on July 17–21. He made a prompt report to the IP, before whom an oral argument was held on July 28. The propriety of these proceedings will be discussed below, under the heading "Fair Hearing".

28. Under these agreements, the Local was required to reimburse the contractor for the differences between the 35¢ an hour paid under the contract and the wage ultimately agreed upon between the Local and the Maryland Chapter.

29. On June 23, the following telegram was sent to the IP by Beckhardt, business manager of Local 28: "At our special meeting of June 22nd 1961 the membership voted unanimously to non concur with telegram of June 15th 1961. What we ask Brother Freeman in these negotiations is to give us time, your cooperation and let things run their course in Baltimore. Believe me we want to be with you and I–0 100 percent."

On August 1 the IP issued a Decision and Order, revoking the Local's charter unless the Local returned its men to work by August 7, readministered the IBEW oath to its members, voted to direct the members of the Labor Committee of the Local to refer all collective bargaining issues currently in dispute with the Maryland Chapter for final and binding decision by the Council, "it being understood that the Local shall not be required to accept the Council clause ruled terminable by Chief Judge Thomsen of the United States District Court for Maryland in Civil No. 12926 and No. 13002 decided May 16, 1961. [194 F.Supp. 494]" The quoted language was carefully chosen to avoid any commitment by the IP that the Local would not be required to accept a more stringent form of Council clause. The Decision and Order of the IP, dated August 1, 1961, is set out in 197 F.Supp. at 104.

The Order was entered for substantially the same reasons for which the IP had refused to grant his consent to the June 16 strike, set out above under the heading "The June 16 Strike", and because he wanted to rid himself and the IBEW of the existing leadership of Local 28 and to discipline the members of the Local for their refusal to submit their disputes to the Council. Other locals had engaged in strikes without prior consent of the IP. Frequently no disciplinary action of any kind had been taken. This was the first case where the charter of a local had ever been revoked. The revocation was intended to be and was a form of discipline of the members of Local 28 for their refusal to agree to submit their disputes to the Council, as desired by the IP, and for having brought suits against the IBEW without exhausting their intra-union remedies.

### Proceedings in This Court and Before the IEC

On August 4, in the suit which Local 28 had filed in this Court on July 17, the

Local filed a motion for a temporary restraining order to block the operation of the August 1 Decision and Order of the IP. Judge Chesnut signed a temporary restraining order, to expire within ten days after entry, unless extended, and granted leave to defendants to move to dissolve the order upon one day's notice. Such notice was given on August 7, and a hearing was held before me on August 8.

Meanwhile, on August 4 the Local had appealed to the IEC from the Decision and Order of the IP dated August 1. On August 5 the members of the Local voted to support its officers 991 to 2.

On August 14 this Court filed its opinion, 197 F.Supp 99, refusing to issue a preliminary injunction and dismissing the complaint, without prejudice. The opinion made substantially the same findings with respect to jurisdiction under sec. 301 of Taft-Hartley as have been made herein, but concluded that this Court should not entertain the case until the IEC had been given an opportunity to decide the appeal which Local 28 had theretofore taken. The Court found that no denial of procedural due process by the referee or the president had been shown by any fact alleged or presented to the Court at that time. 197 F.Supp. at 108. The Court noted that individual members have rights under the LMRDA, which will be protected by the courts, and have other rights which will be protected by the NLRB, but noted that those rights were not then before the Court. 197 F.Supp. at 107. The motion to dismiss the complaint was therefore granted, without prejudice to the right of Local 28 or of its individual members to seek appropriate relief in this or any other court as future events might warrant. 197 F.Supp. at 108.

On September 12 the IEC heard argument on the appeal of Local 28 [30] and on September 30 affirmed the order of the IP. The proceedings before the IEC

---

30. Although apparently under the IBEW constitution it might have refused to entertain the appeal because Local 28 had

not complied with the order from which the appeal was taken.

will be discussed below, under the heading "Fair Hearing".

## Local 24

In the meantime, in July 1961, pursuant to authority granted by the IP in June, International Representative Terry laid the groundwork for the formation of a new local to supplant Local 28 in the Baltimore area. This new Local, No. 24, is and from its inception has been dominated by representatives of the International. Supervisory personnel of key members of the Maryland Chapter of NECA, including vice-presidents of contracting companies who resigned their offices to become more active in union affairs, applied for a charter on August 22, with the assistance of Terry. The charter was granted to Local 24 on August 27, 1961. Despite the denials of the chief executive officers of Blumenthal-Kahn and Eastern Electric, I find that these leading contractors, whose chief executives were members of the negotiating team of NECA, cooperated with Terry in the organization of Local 24. By-laws suggested by the International were adopted and officers were elected while Local 24 consisted of approximately 30 men and membership had not yet been thrown open beyond the charter group. IBEW lent $25,000, without interest, to the new Local, and assigned Terry and another International representative to supervise and assist the carefully chosen leaders. After brief negotiations, Local 24 and the Maryland Chapter entered into an agreement on September 21, calling for an increase which over a period of two years amounted approximately to the same amount of money as the final offer of the Chapter to Local 28. In October 1961 Terry, with the assistance of another International representative and the business manager of Local 24, composed and sent to each member of Local 28 three weekly anonymous letters designed to break the morale of Local 28's membership by pointing out that as a result of its resistance to the IP: (1) Local 28 had been consigned to "outcast independent status"; (2) many of Local 28's members had been fired from various jobs; and (3) Local 24 had succeeded in substituting itself for Local 28 in contractual relations with various employers.

## Discussion

In an important article published in 1960,[31] Professor Archibald Cox said: "Upon the theory that improper expulsion violates the member's interest in the organization's property or a contract between him and other members made up of the constitution and by-laws or, in recent years, upon the ground that there is a tortious interference with an advantageous relationship, the state will set an expulsion aside upon any of five grounds: (1) The procedure violated the Union's constitution or by-laws. (2) The constitution or by-laws did not authorize expulsion for the alleged offense. (3) The procedure, although it conformed to the Union's constitution and by-laws, did not afford the members a fair hearing. (4) The expulsion, although it was authorized by the Union's constitution and by-laws was 'unreasonable,' contrary to 'public policy,' or contrary to 'natural justice.' (5) The expulsion was in bad faith because the purported ground was only a pretense for getting rid of a troublesome member. The rule invalidating expulsion without a hearing requires observance of much the same minimum safeguards as the due process clause of the Fifth and Fourteenth Amendments has been held to impose upon the adjudicative procedures of the state and federal governments."

Relatively few decisions have been published dealing with the revocation of the charter of a local union. But it has generally been held that the procedural requirements in regard to the expulsion or suspension of a member of a union apply likewise in disciplinary proceedings

31. Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819, at 835–836. See also Cox, The Role of Law In Preserving Union Democracy, 72 Harv.L.Rev. 609, at 615.

by a parent union against a subordinate union taken with a view to revoking or suspending the latters' charter. 21 A. L.R.2d 1397, at 1403.[32]

### I.

*The June Strike As a Permissible Ground for Revocation Under the IBEW Constitution*

Plaintiffs' first point is that the stated ground for the revocation of the charter —that Local 28 had engaged in a strike without the consent of the IP in violation of the IBEW constitution—was not a sufficient ground, because the strike was not the kind of strike which required such approval.

Art. XVII, sec. 13, of the IBEW constitution provides: "No L.U. shall cause or allow a stoppage of work in any controversy of a general nature before obtaining consent of the I.P. The I.P., or his representative, has the power at any time to enter any situation or controversy involving a L.U. or any of its members, and the decision of the I.P., direct or through his representative, shall be accepted by the L.U. and its officers, subject to appeal to the I.E.C. and I.C." [33]

Local 28 contends that despite this provision the consent of the IP to the Local's strike in June 1961 was not necessary, arguing that the term "stoppage of work", as used in the constitution, means a stoppage of work during the term of a working agreement, and does not include an economic strike in the absence of such an agreement. Several members

of Local 28 and Frank C. Ellis, president of the Baltimore Building and Construction Trades Council, testified that the meaning argued by Local 28 was the accepted meaning of the term in the labor field, but on cross-examination they showed that they had no sound basis for their opinion, and Ellis admitted that "work stoppage" would include a strike after the termination of a collective agreement if the men were still at work during negotiations under an informal agreement or understanding. That, of course, was the situation in this case in June 1961. The history of the strike clauses in the constitution and other bits of evidence relied on by plaintiffs are too vague to overcome the plain meaning of the words, supported by the expert opinion of Dr. John T. Dunlop, a recognized and experienced expert in the construction industry portion of the labor field, the decision of the IEC construing the section in question, and the refusal of the 1958 Convention to amend this very provision at the request of Local 28.[34] Moreover, Art. IV, sec. 3(2) of the IBEW constitution, as well as Art. XVII, sec. 13, quoted above, permitted an appeal to the IEC from the decision of the IP that this was a strike or work stoppage which required his consent, and no such appeal was taken by Local 28.[35]

### II.

But, plaintiffs argue, even if the strike was one which required the approval of the IP, and therefore amounted to a breach of the constitution by Local 28, the Decision and Order of the IP dated

32. See particularly Weighers, Warehousemen and C. W. Union, Local 38 v. Green, 157 Ore. 394, 72 P.2d 55; Mixed Local etc. Union v. Hotel and Restaurant Employees, etc., 212 Minn. 587, 4 N.W.2d 771; Ellis v. American Federation of Labor, 48 Cal.App.2d 440, 120 P.2d 79; Washington Local Lodge v. International Brotherhood of Boilermakers, 33 Wash. 2d 1, at 68–69, 203 P.2d 1019, at 1058–1059; Gardner v. Newbert, 74 Ind.App. 183, 128 N.E. 704.

33. The evidence shows that provisions in union constitutions requiring the consent of the IP or other International officials

before a local may engage in a strike are common in the building trades and other industries.

34. It should also be noted that at the meeting at which the strike vote was taken one of the members of Local 28 asked whether the strike had been authorized by the IP. Beckhardt, the business manager of Local 28, did not say that such consent was unnecessary, but replied that they had obtained a "green light" from the IP.

35. Cox, The Rule of Law in Preserving Union Democracy, 72 Harv.L.Rev. 609, 614–615.

August 1, 1961, revoking the charter of Local 28, was illegal and invalid, because it (a) was rendered without a fair hearing before a properly constituted tribunal, (b) was a breach of the duty owed by the IP to Local 28 and its members, was entered in bad faith for improper reasons, and so was illegal and against public policy, and (c) was an unreasonably severe sanction. These three points are obviously interrelated, but it will clarify the discussion to treat them separately, so far as that can be done without repetition.

### (a)

#### Fair Hearing

■ It is a settled principle that a member of a union is entitled to a full and fair hearing before he is expelled, whether or not the union constitution specifically so provides.[36] Louis Sherman, the IBEW general counsel and one of its counsel of record in this case, recently stated in an article in the Northwestern Law Review: "The decisions of the American, English and Canadian courts have established the common law rule that disciplinary proceedings in a union or other unincorporated association must be conducted in accordance with the requirements of due process. These requirements include the giving of adequate notice of the charges and a fair hearing to an accused member. The legal necessity for these procedures ex-

ists independently of the provisions in the constitution and by-laws of the union or other association. The justification for the due process requirement at common law is to be found in such concepts as 'natural justice,' 'law of the land,' and 'public policy.' "[37]

One of the basic requisites of a fair hearing is an unbiased and disinterested tribunal.[38] We need not attempt in this case to unravel the tangled provisions of the IBEW constitution, placing on one side those issues which may be decided by the IP and those which must go to the IEC.[39] Whether or not the issue which the IP undertook to decide in his Decision and Order of August 1, 1961, was one which he had the authority to decide in the ordinary case, it was one which he should have referred to the IEC or some other impartial tribunal in this case, where the propriety of his own action and his own good faith and motives in refusing consent to the strike and in preparing, filing and pressing the charges were being called into question. The IP admitted that it was a "rather difficult question to answer" why he did not prefer charges before the IEC. No doubt the referee Schedler was a fair and impartial man, but he was not given authority to decide the questions at issue, and the IP refused to testify, because, as he said later, "in the final analysis I would have to make a decision on the case".

36. Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049, 1079–1092; Cox, The Role of Law in Preserving Union Democracy, 72 Harv.L.Rev. 609, 615–619; 21 A.L.R.2d 1397, at 1406; Gilmore v. Palmer, 109 Misc. 552, 179 N.Y.S. 1; United Brotherhood of Carpenters v. Local Union No. 14, Tex. Civ.App., 178 S.W.2d 58, at 569 on reh.

37. Louis Sherman, The Individual Member and the Union: The Bill of Rights Title in the Labor-Management Reporting and Disclosure Act of 1959, 54 N.W. L.Rev. 803 at 820–821.

38. See Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049, at 1082: "The organizational structure of unions is wholly lacking in anything equivalent to an independent judiciary.

On the contrary, the discipline procedure tends strongly to be dominated by the officers and groups in power. This creates the greatest single danger in the area of union discipline—the frequent lack of a completely unbiased tribunal. The courts have shown some awareness of this and have given protection against any discoverable taint of bias.

"Bias may take the flagrant forms of judging the case before it is heard, or deliberately using discipline as a device to eliminate disliked members. * * * Bias may also take the less obvious form of combining the prosecuting and judicial functions. * * *"

39. See e. g. Art. IV, secs. 3(2) and 3(8), and Art. IX, secs. 4 and 6. They are set out in 197 F.Supp. at 102, n. 2.

The general counsel for the IBEW drew the charges, presented evidence in support of the charges, cross-examined the Local's witnesses, argued the case and also consulted with and advised the IP with regard to the subject matter of the proceedings and the provisions of his order, out of the presence of counsel for the Local.

The appeal to the IEC did not cure the fatal defect in the procedure. Defendant argues that it was in effect a trial de novo because O'Doherty, the attorney for Local 28, was allowed to read from the depositions of the IP and other witnesses which had been taken for use in the Parks case and to challenge the good faith and impartiality of the IP and the members of the IEC in the course of his intemperate and ill-advised argument. However, the notice of the hearing sent to Local 28 by the IEC, the brief of counsel for the International, the statements of the chairman and of the independent counsel of the IEC, the nature of the hearing, and the wording and the tenor of the decision, show conclusively that the IEC treated the matter as an appellate proceeding, an appeal from the decision of the IP.

This Court does not adopt plaintiffs' contention that the IEC was necessarily prejudiced because most of its members had been originally appointed by the IP to fill vacancies, and some had not yet been elected.[40] The IEC's interpretation of Art. XVII, sec. 13, of the IBEW constitution, discussed in I, above, is entitled to respect, even if it is not binding on the Court. But its decision on the appeal, however well-intentioned, cannot cure the

fatal defect in the original hearing and in the decision and order of the IP, revoking the charter of Local 28.[41] The effect of this conclusion on the relief which should be granted in the two cases will be discussed below under the heading "Relief".

### (b)—1

### *Breach of Duty*

Plaintiffs make the further contention that in revoking the charter of Local 28 the IP acted maliciously, in bad faith and in breach of the duty he owed to Local 28 and its members. Defendant denies the charge and states that the action was taken to maintain necessary union discipline.

■■■ Engaging in an unauthorized strike is, of course, a serious breach of discipline, for which a member may be expelled or a charter be revoked, after a fair hearing.[42] Plaintiffs argue, however, that the action was not really taken for this reason; that other locals had engaged in unauthorized strikes, and no other charter had ever been revoked, indeed, many of the offenders had not been disciplined in any way; that the pretended reason for revoking the charter of Local 28 was largely a sham, the principal reasons being the desire of the IP to rid himself of troublesome leadership in the Baltimore area, and to discipline the members of Local 28 for their refusal to agree to submit their disputes to the Council and for having brought several suits against him and the IBEW. I find that the action of the IP was taken from mixed motives—for the reasons

---

40. Despite some authority to the contrary, see Summers, The Law of Union Discipline: What the Courts Do In Fact, 70 Yale L.J. 175, at 204.

41. The question has been raised whether the IP was required to give Local 28 any hearing before he revoked its charter, in view of the power given the IP by Art. IV, sec. 3(8) of the constitution. It is true that engaging in a strike without the consent of the IP is a serious offense, justifying expulsion. But expulsion is a

severe penalty, affecting all of the members of the Local, not only the intransigent leaders. Under the principles of "natural justice", referred to by Sherman as well as by the other authorities cited above, it should not be imposed without a hearing and, when a hearing is in fact given, it should be a fair one. See authorities in n. 36, above.

42. Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049, 1065.

suggested by plaintiffs as well as for the stated reason relied on by defendant.[43]

Defendant argues that the IP owed a duty to the union as a whole, and could not properly grant permission to one local to engage in a strike which he felt to be contrary to the best interests of the IBEW, nor allow a local to flout the authority vested in him by the IBEW constitution. That is true, so long as he acted in good faith and not maliciously or in violation of the duty he owed to the members of Local 28, as well as to all other members of the IBEW.

There has been much argument as to whether the IP acted maliciously in revoking the charter of Local 28. Part of the difficulty is semantic. There was no sufficient evidence that the IP was moved by what is sometimes called express or particular malice, i. e. ill-will, spite, a grudge, or a desire to be revenged on a particular person or persons, resulting in a deliberate intention to commit an injury. But he did act wilfully and intentionally, for the purpose, inter alia, of imposing severe discipline on the members of Local 28, and without due regard for the duty he owed to them, as well as to the IBEW as a whole. In that sense his action amounted to legal malice. See Black's Law Dictionary, 3rd ed., at 1146–48.

The important conclusion is that the revocation of the charter of Local 28 by the IP under the circumstances of this case was a breach of the duty he and the International owed to Local 28 and its members under the union constitution, and amounted to a breach of the contract represented by that constitution. The effect of this breach will be discussed below under the heading "Relief".

### (b)—2

### Legality and Public Policy

Plaintiffs contend that the act of the IP was taken in furtherance of his effort to require Local 28 to include the yellow sheet "evergreen" Council clause in its agreement with NECA, and was therefore illegal. In the first place, there is some doubt whether, after the decision of this Court in May and the dismissal of the appeal in June, the IP really intended to require that the yellow sheet clause be included in the agreement. It was eliminated from the agreements signed by Local 24 and by the Washington, D. C., local, perhaps because the IP regarded the leadership of those unions differently, and perhaps because of legal advice he received during the summer and early fall. Secondly, it is not necessary in the instant cases, any more than in the previous cases before this Court, to pass on the legality of that clause. I

43. In the present cases the International contends that the collective bargaining agreement of March 7, 1958, see 194 F. Supp. at 495, required Local 28 to submit to the Council the disputes as to wages and working conditions pending in March 1961, before the agreement was terminated by the Local, even though the unilateral submission was not presented to the Council until May 1. This point was not pressed by the Maryland Chapter in Local 28's suit against it, although the point was discussed during the hearings on May 10 and May 11. It was not decided by this Court, nor referred to by the Council in its decision on June 2. The point was not mentioned by the IP in his telegram of June 15. It was not relied on by the IP or the IEC in their respective decisions of August 1 and September 30, and was not in fact a basis for their decisions. It is raised

belatedly at this time, and cannot justify any action of the IP.

Art. XVII, sec. 11 of the IBEW constitution provides: "All L.U.'s shall be compelled to live up to all approved agreements unless broken or terminated by the other party or parties, which fact shall first be ascertained by the I.P. No agreement of any kind or nature shall be abrogated without sanction of the I.P." The abrogation of the agreement on March 7, 1958, between Local 28 and the Maryland Chapter was not sanctioned by the IP, but he did not charge Local 28 with a violation of this section and neither the IP nor the IEC based their decisions on any such violation. Moreover, this section evidently antedates the Taft-Hartley Act, and it is doubtful whether it is now valid. It cannot now be used to justify the decision of the IP.

adhere to the views expressed in 194 F. Supp. at 500, 501, but prefer to rest this decision, as I did that one, on other grounds.

The questions of public policy in these cases are difficult. We have here a sharp conflict between two desirable principles—stability and labor peace on the one hand, and democratic control of local unions by their members on the other. See the thoughtful discussion of the problem by Professor Cox in the article referred to above, 58 Mich.L.R. 819, particularly pages 829–831, which I adopt rather than the oversimplification of the problem in favor of stability urged by defendant.

In the opinion filed in the case of Local 28 v. Maryland Chapter, based upon facts then before the Court, I stated that "it is highly desirable that the local unions of IBEW and the chapters of NECA take advantage of the services of the Council; the evidence shows that it has served all parties well over the years." 194 F.Supp. at 501–502. I adhere to the view that the Council has served the parties well over the years. Wages have steadily increased, in line with other comparable building trades, and there have been remarkably few strikes. The evidence in the instant cases, however, makes it clear that those results have been achieved through a tight control over the agreements of most local unions by the international officers of IBEW, particularly the IP, at the cost of a large measure of the autonomy of the local unions.[44] The IBEW constitution gives at least lip service to the principle that the local unions shall do the collective bargaining for their members but it also contains provisions which appear to authorize the control over the affairs of the local unions exercised by the IP.

The provisions which shall be included in the constitution and the policies which shall be followed by the officers are matters for the union as a whole

to decide, subject to the restraints imposed by law. Federal courts may impose such restraints only within the jurisdictional limits provided by Congressional enactments, and must follow the policies established by the statutes, as interpreted by authoritative decisions.

The LMRDA is a step in the direction of democratic control, along a carefully defined path. It does not authorize a court to permit the members of a local union to flout the constitution and policies of the International and still claim the rights and privileges of membership therein. On the other hand, an officer of the International may not disregard his common law and statutory duty to the members of erring union, nor ignore their rights. He should be a good shepherd, and must not chastise his flock with unreasonable severity or for improper reasons.

### (c)

*Reasonablenss of the Sanction*

The revocation of a local's charter is an extremely drastic sanction, affecting all of its members. It is particularly important to a local union of IBEW to be a part of the Building and Construction Trades Department of the AFL–CIO. The revocation of its charter removed Local 28 from the AFL–CIO and the Baltimore Building and Construction Trades Council, so that Local 28's picket line was not honored by many unionized construction workers, and made it difficult for Local 28 to place its members in jobs outside the Local's jurisdiction. It would be very difficult if not impossible for Local 28 to attract or hold members as an independent union, because the usual hiring hall arrangement gives priority to those who have passed an IBEW examination, and because any member who stayed with Local 28 as an independent union would forfeit his rights in the IBEW pension plan and the IBEW death benefit plan.

44. The Local was afraid to submit its dispute to the Council in the Summer of 1961, and the evidence in the instant cases shows that this fear was justified by the attitude of Freeman and other members of the Council of May 15 and throughout these cases.

If a member withdraws from Local 28 in order to preserve his IBEW membership, he forfeits his claims to the pension, sickness, hospitalization, disability and other benefits provided by the Local. If Local 28 is forced to dissolve, all of its members, including those now drawing retirement pension benefits, would be deprived of those continuing benefits and would be compelled to accept in lieu thereof approximately $400, representing the proportionate share of each member in the Local's funds.

Nevertheless, where a particular sanction is clearly permitted by the constitution of a union, the courts should be slow in substituting their judgment for that of the responsible union officials in determining whether or not it is too severe. Where, however, the imposition of a particular sanction is clearly unreasonable under all the circumstances and unjust to individual members of the offending union, the courts should not hesitate to exercise whatever jurisdiction they may have to correct the injustice.[45]

The reasonableness of the sanction in this case must be considered in connection with the question of unclean hands raised by defendant.

### III.

### *Unclean Hands*

Defendant argues that plaintiffs are barred by their own unclean hands from any relief in these cases. This claim is based upon a long list of accusations made by the trial attorneys for the IBEW—that Local 28 did not bargain fairly with the Maryland Chapter; that its officers and leaders made deliberate misstatements at its meetings and elsewhere, including misstatements to the

judges of this Court in the several cases; and that Local 28 was at all times after March 31 determined to strike without the consent of the IP, in violation of the IBEW constitution, if it did not receive its full demands.

The issue of unfair bargaining is before the NLRB: it would be inappropriate for this Court to say more than that there was no such unfair bargaining by the Local as would justify denial of the relief which will be granted in this case.

There have been no such misstatements by counsel as would justify a finding of unclean hands.[46] One of the unhappy features of this case has been the lack of candor on the part of some of the officers and leaders of all the organizations involved, IBEW, the Local, NECA and the Maryland Chapter.

The deliberate misstatement as to the "green light" made by Local 28's business manager at the meeting when the strike was called, together with the Local's stubborn insistence on striking in defiance of the IBEW constitution, without appealing from the action of the IP in refusing his consent to the strike, might be sufficient to bar relief if we were dealing only with the rights of the officers and leaders of the Local. But we are dealing also with the rights of many hundreds of innocent members, who were caught in the struggle between the IP and the present officers and leaders of Local 28. Their rights as members of the IBEW are of great importance to them; so are their rights as members of Local 28. Many of them followed the reckless leadership of their officers, but did so as the result of misstatements, innocent or not, and unsound legal opinions, frequently reiterated.

---

45. Reilly v. Hogan, Sup., 32 N.Y.S.2d 864, aff'd without op. 264 App.Div. 855, 36 N.Y.S.2d 423, leave to app. den. 265 App. Div. 805, 37 N.Y.S.2d 426; Cason v. Glass Bottle Blowers Ass'n., 37 Cal.2d 134, 231 P.2d 6, 21 A.L.R.2d 1387; Washington Local Lodge v. International Brotherhood of Boilermakers, 33 Wash.2d 1, at 74, 203 P.2d 1019, at 1061, and cases cited in n. 32 above.

46. Some inaccurate statements have been made from time to time by counsel for both sides in these and earlier cases, all or most of which I believe to have been unintentional. Certainly nothing has been said by counsel for the Local in this case more serious than the filing of IBEW's original answer to Local's interrogatory No. 4, which was not corrected until after counsel for the Local had proved that it was erroneous.

Some of them have joined Local 24, some have obtained employment out of the Baltimore area, and some in the area, but many have not found employment. The work in the Baltimore area has been done partly by former members of Local 28 who joined Local 24, partly by IBEW members from out of the City, partly by new members recruited by Local 24, and partly by contractors who have employed members of Local 28. The interests of all of these groups should be considered in the instant cases, as well as the general interest of all members of the IBEW in seeing that its policies are enforced, in accordance with the IBEW constitution and the general law.

All factors considered, I conclude that apart from the questions of fair hearing and good faith, the punishment of Local 28 and its members by the revocation of its charter was unreasonably severe and so unjust as to call for relief from this Court.

### RELIEF

■ A. The revocation of the charter of Local 28, pursuant to the Decision and Order of the IP dated August 1, 1961, without a fair hearing and for the reasons and under the circumstances shown by the evidence, was a breach of the contract between the Local and the International, represented by the IBEW constitution, entitling the Local to relief under sec. 301(a) of Taft-Hartley, 29 U.S.C.A. § 185(a). The only effective means to cure that breach is to require the defendant to set aside the revocation of the charter of Local 28. Defendant's argument that Norris-LaGuardia bars injunctive relief in the action brought by Local 28 cannot be sustained. This case does not come within any of the classes set out in sec. 4, 29 U.S.C.A. § 104, in which injunctions are absolutely prohibited. Sec. 7, 29 U.S.C.A. § 107, does not bar such relief, because a consideration of the entire act, including the provisions of sec. 4, as sug-

gested in Lincoln Mills, and of the cases cited and discussed under "Jurisdiction", supra, convinces me that this case does not involve or grow out of a "labor dispute" within the meaning and intent of that term as defined in sec. 13, 29 U.S. C.A. § 113 and used in sec. 7.[47]

■ B. The revocation amounted to unreasonable and unjust discipline and punishment of the members of Local 28, in violation of their rights under sec. 101(a) (5) and sec. 609 of Landrum-Griffin, 29 U.S.C.A. §§ 411(a) (5) and 529, entitling them to relief under sec. 102, 29 U.S.C.A. § 412. Again, the effective means by which the members of Local 28 may be restored to their former rights and privileges is by reinstatement of the charter of Local 28. The Parks case is brought under Landrum-Griffin, which specifically authorizes injunctive relief. Sec. 102, 29 U.S.C.A. § 412.

Both Local 28 and the members, therefore, are entitled to a decree enjoining IBEW and its officers from giving effect to the revocation of the charter of Local 28, and requiring them to restore Local 28 and its members to their former rights and privileges. To make this relief fully effective, and because the creation of a subservient local was part of the plan for getting rid of vigorous and troublesome leadership in the Baltimore area and punishing the members of Local 28, the decree will require the IBEW to revoke the charter of Local 24.

This relief, however, will be conditioned, and the decree will contain a provision requiring Local 28 to admit to its membership all present members of Local 24 who have been employed by members of the Maryland Chapter, and to restore to their privileges as members of Local 28, upon payment of the minimum necessary assessments, all former members of Local 28 who left that Local to join Local 24 or any other local of the IBEW.

---

47. It is therefore unnecessary to decide whether this Court could or should make all of the findings listed in sec. 7, as pre-requisites to the issuance of an injunction in "labor disputes".

Under all the circumstances it would be unjust and unreasonable to allow damages to the Local. The members asked for no damages. Nor should any counsel fee be allowed to plaintiffs against IBEW in either case.[48]

With a commendable desire to assist the individual members, counsel for both sides arranged that the rights of the various groups as members of IBEW and as members of Local 28 be preserved pendente lite, as far as practicable. The attorneys for the International stated to the Court that the officers desired to file charges against those leaders of Local 28 who the officers felt had violated or encouraged the violation of the IBEW constitution. At the suggestion of the Court, it was agreed that the number who might be so charged be limited to 25. The decree will not prevent the proper officials of the IBEW from pressing the charges they have heretofore filed against such individuals, before any proper tribunal, nor from enforcing any reasonable punishment, including expulsion, which may be legally imposed.

The Court will retain jurisdiction of both cases to supervise the carrying out of the relief granted, and to approve the propriety of any dues, assessments or other payments which may be required by either Local 28 or IBEW as a prerequisite to the enjoyment of the rights granted by the decree.

## CONCLUSION

A word of caution is required. This decision does not mean that Local 28 may continue with impunity to flout the constitution and policies of the IBEW.

It now has a construction of Art. XVII, sec. 13, by the Court, which must be observed, along with the other provisions of the IBEW constitution, if Local 28 wishes to continue as a part of that union. The officials of the International must act fairly to Local 28 and its members, but may file charges for proper reasons in the event of future misconduct by the Local or any of its members; and after a fair hearing an impartial tribunal may impose reasonable sanctions, including expulsion of a member or revocation of the charter of the Local for serious future infractions.

In view of the attitude of Freeman and Geary and other Council members during the past year, it would not be reasonable to require Local 28 to submit its disputes with the Maryland Chapter to the Council at this time. But it is highly desirable for Local 28 and the Maryland Chapter to negotiate a new agreement as speedily as possible, using arbitration if they cannot agree on all the terms, and for all of the organizations involved to face the future with a frank recognition of the problems involved, but with a determination to solve them without the bitterness which has characterized the recent past.

Counsel for plaintiffs should promptly submit a draft of a proposed decree to counsel for defendant. If the form of the decree is not agreed upon within three days thereafter, the Court will prepare and enter a decree.

## SUPPLEMENTARY OPINION

After many conferences counsel have agreed upon the wording of the decree [49]

48. In view of the part played by the attorney for Local 28 in the events leading up to the strike and immediately thereafter, and of the rights of all persons then members of the Local, the decree will provide that no fee be paid to any attorney out of the funds of Local 28 without the approval of the Court.

49. The Decree reads as follows: "The above entitled cause having come on for hearing in open court, evidence having been submitted, memoranda having been filed, counsel having been heard and the proceedings having been read and considered, it is this 30th day of March, 1962, by the United States District Court for the District of Maryland,
"ORDERED:
"1. That the defendant, International Brotherhood of Electrical Workers, its officers, agents, servants and employees, and those acting in concert with them, be and they are hereby mandatorily enjoined, directed and commanded, as follows:
"a. To rescind and set aside the order of the defendant's International pres-

ident revoking the charter of Local Union No. 28, IBEW (said order being dated August 1, 1961, and having been affirmed by the International Executive Council of the defendant on September 30, 1961); to accept the per capita tax for the quarters commencing October, 1961 and January 1, 1962, deposited in the Registry of this Court, covering the membership of Local 28, to the same extent and effect as if the said per capita tax had been lawfully paid to the defendant by the said Local on the dates when due, and accepted by the defendant as of said dates. The Clerk of this Court is hereby authorized and directed forthwith to pay to defendant through its counsel or anyone designated by its counsel, the sum so deposited in the Registry of this Court.

"b. To restore, recognize and honor the affiliation of Local 28 as a duly chartered Local Union of the defendant and to accord to said Local all the rights and privileges to which duly chartered Locals of the defendant are entitled, including but not limited to the right to use the IBEW official receipts and seals, and subject to all lawful obligations of duly chartered Locals of the defendant.

"c. To recognize and honor the IBEW membership of all members of Local 28 for whom the per capita tax was tendered as aforesaid, and to accord to Local 28 and its said members all their former rights and privileges in the IBEW to the same extent as if the charter of Local 28 had never been revoked.

"d. (1) Because of an agreement made by the parties at the suggestion of the Court limiting the number of individual members of Local 28 to be charged, to prefer or press no charges in the future against any individual members of Local 28 for any past conduct involving the issues in the instant cases, provided, however, that the proper officials of the defendant shall not be precluded from pressing the charges for such past conduct which have heretofore been filed against certain members of Local 28, before any proper tribunal, nor from enforcing such reasonable punishment, if any, including expulsion which may be legally imposed.

"(2) Nothing in this judgment shall restrain or prevent defendant, or any of its proper officers or officials, from and after the date this judgment takes effect, from preferring and prosecuting charges, before any proper tribunal, against Local 28 or any individual members of Local 28 for breaches of defendant's Constitution occurring after said judgment takes effect, (including continuation of the present strike after such date and after receipt of a reasonable written notice from the I.P., issued with proper motives in compliance with the defendant's Constitution to Local 28 to terminate it) before any proper tribunal or from enforcing such reasonable disciplinary punishment, if any, including revocation of charter or expulsion from membership, which may be legally imposed. Such notice shall not, with respect to the present strike, require resolution of collective bargaining issues by the Council on Industrial Relations. Until this judgment takes effect, and during the pendency of any appeal from this decree and before final termination of this litigation, Local 28, its officers and members shall not be required to comply with any orders or directions by defendant, its officers, agents, servants and employees, except that the members of Local 28 shall be required to pay dues and faithfully perform the requirements of the stipulation entered into by the plaintiffs and the defendant dated March 20, 1962.

"e. To revoke and cancel the charter heretofore granted to Local 24, IBEW, and to refrain from recognizing any rights or privileges in said Local 24 as an affiliated Local of the defendant.

"2. The relief to Local 28 and its members under this Decree is conditioned upon the reasonable protection of the rights of the members of Local 28 who left that union to join Local 24 or any other Local Union of defendant, and upon similar protection to such members of Local 24 as may subsequently be determined as hereinafter provided, who have not heretofore been members of Local 28. The Court appoints H. Raymond Cluster, Esquire, as Special Master in this cause to conduct such investigations and take such evidence if any as may be necessary, to make recommendations to the Court, in the light of the facts relating to the membership of Locals 28 and 24, the property rights of the respective members, and any other relevant factors, with respect to the following:

"a. The members or classes of members of Local 24 who should be admitted to Local 28; and whether, and if so on what basis any distinctions should be made as between members or classes of members of Local 24 with respect to eligibility for or conditions of admission to Local 28.

"b. The nature, amounts and method of payment of all dues, assessments or monetary payments of any kind, if any,

and upon a stipulation for a stay of the decree pending appeal.[50] The Court is especially pleased that the parties have been able to agree upon a master.

Counsel for defendant International requested the Court to include in the decree not only the provisions of paragraphs 1(d) (1) and 1(d) (2), but also the following paragraph:

"(3) Nothing in this judgment shall restrain or prevent defendant, or any of its proper officers or offi-

which should or may be required as a condition of readmission of former members of Local 28 or of the admission of new members from Local 24 into Local 28.

"c. The time within which application must be made, members must be admitted or readmitted, and the procedures by which members are to be admitted or readmitted in accordance herewith.

"d. Procedures for the implementation of this Decree with a view to prompt and fair resolution of the application in individual cases of the terms of this Decree and such further orders as may be entered by the Court after recommendations of the aforesaid Special Master.

"e. Such other matters pertaining to relief, as will, in conformity with the opinion of this Court, promote the ends of justice under the circumstances.

"3. All claims against defendant for damages and counsel fee are denied. No counsel fee shall be paid to any attorney out of the funds of Local 28 without the approval of the Court.

"4. Defendant's counterclaim in the Local 28 case is dismissed.

"5. The costs of these cases shall be paid by the defendant.

"6. The parties and their counsel shall cooperate to the end that the said parties, their counsel and the said Master shall be furnished such data, records and information as may be necessary in order to effectuate the terms of this Decree.

"7. Jurisdiction in both the above entitled cases is retained to supervise the carrying out of the relief granted."

50. The Stipulation reads as follows: "It is agreed and stipulated by the parties as follows:

"1. The entry of a final decree in this case shall be delayed for one week from the date hereof in order to permit further exploration of possible settlement.

"2. Any decree which may be entered in this case shall be stayed pending appeal, subject to the following terms and conditions:

"(a) Local Union 28 may forthwith issue and continue to issue, until the final termination of this litigation by settlement or on appeal, official IBEW dues receipts, membership cards, travelers cards and similar evidence of membership in the IBEW, effective and good only for the period of the litigation plus fifteen days thereafter, to all of its members who are in good standing and who were in good standing in Local 28 as of the quarter ending December 31, 1961.

"(b) Such evidence of membership shall be honored during said period by the parties to the same extent as similar evidence of membership issued to the members of any duly chartered local of defendant. During said period defendant shall not advise, or take any position with, any employer, association, local or international union, the AFL–CIO or any Department or Council thereof, that the members of Local 28 are to be regarded as 'non-union' or as anything other than members in good standing in the IBEW.

"(c) Defendant will make all reasonable efforts to have the Clerk docket an appeal for argument not later than the June, 1962, term of the United States Court of Appeals for the Fourth Circuit. If the appeal is not docketed by that time the plaintiffs reserve the right to a rehearing on the question of a stay of the decree.

"(d) The IBEW shall file an appeal bond, signed by proper officials of the IBEW, without surety, in an amount to be fixed by the Court conditioned upon the payment of costs on appeal, if any, and the payment to Local 28 and its members of any damages which they may prove to have been caused by the stay of the Court's decree if affirmed or by violation of the terms of such stay pending appeal.

"(e) If the litigation is not determined by settlement or by decision on appeal by June 25, 1962, Local 28 shall thereafter have the right to prepare resolutions, elect delegates and make other preparations for the September 1962 International Convention, subject to the decision of the appeal herein. Defendant will not be bound, if it should win on appeal, to recognize or honor these acts or delegates of Local 28 covered by this section."

cials, from preferring and prosecuting charges, before any proper tribunal, against Local 28 for alleged recent past breaches of defendant's Constitution including the alleged conduct of Local 28 in 1961 which was the basis and subject of the order of defendant's International President of August 1, 1961, (hereby rescinded, set aside and restrained) or from enforcing such reasonable disciplinary punishment, if any, including absolute, or properly conditioned, suspension or revocation of Local 28's Charter, if legally warranted."

Because of the mixed motives of the IP in refusing his consent to the June 16 strike, as set out in the principal opinion under the heading "The June 16 Strike", including footnotes 24 through 27, and in the light of all the facts and circumstances of the case, the proposed paragraph 1(d) (3) would not be equitable.